[No. B052885. Second Dist., Div. One. Dec. 5, 1991.]

ERSA GRAE CORPORATION, Plaintiff and Appellant, v.
FLUOR CORPORATION, Defendant and Appellant.

614

**616**

## COUNSEL

McCambridge, Deixler, Marmaro & Goldberg, Bert H. Deixler, Shinaan S. Krakowsky and Lary Alan Rappaport for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Richard J. Lucas, James A. Hughes, W. Douglas Kari and Stephen E. Whittaker for Defendant and Appellant.

## OPINION

**VOGEL, J.**—Ersa Grae Corporation sued Fluor Corporation for damages for breach of a contract to transfer real property to Ersa Grae. Fluor defended by asserting, among other things, that no contract was formed because all offers had been revoked before Ersa Grae accepted. In a bifurcated trial, a jury found the parties had an enforceable contract and, thereafter, a second jury awarded $13 million to Ersa Grae. Following a series of posttrial motions, the trial court conditionally granted Fluor's motion for a new trial on the ground the judgment was excessive and ultimately reduced the judgment to $3 million. Fluor appeals from the judgment and Ersa Grae cross-appeals from the order granting a new trial. We affirm the findings that the parties had an enforceable contract which was breached by Fluor but reverse and remand for a new trial on the damage issues.

### FACTS

Fluor is an international engineering and construction firm based in Irvine, specializing in petrochemical industry projects. In 1985, Fluor decided to

construct an office building for its own use in the Docklands area of London, a rundown port undergoing redevelopment. On April 14, 1986, Fluor entered into a written agreement with the London Docklands Development Corporation (LDDC), the owner of the Docklands, under which Fluor obtained (1) a license to construct a 190,000-square-foot office building on a vacant 3.8-acre parcel and, upon completion of the building, (2) a 200-year land lease for the 3.8-acre parcel. Prior to completion of the project, assignment of Fluor's interest required the LDDC's approval. After completion, Fluor could sell the building and transfer the land lease without the LDDC's approval.

Within a month after it signed the LDDC agreement, a downturn in the petrochemical industry prompted Fluor to conclude it no longer needed the Docklands space. In late May, Nigel Hancock, a Fluor financial controller based in London, began discussing the sale of Fluor's Docklands interests with National Leasing & Finance Company, a British company active in the Docklands.

At about the same time, Fluor (acting through Bruce Terrell) contacted Darrell Turner, an employee of the Horne Company, a Houston, Texas, commercial real estate brokerage firm representing other companies with interests in the Docklands, to inquire whether Horne could assist Fluor in locating a purchaser for Fluor's Docklands interest. Turner agreed to try and later discussed Fluor's Docklands property with Fletcher Gibson, another Horne broker. In late May or early June, Gibson discussed Fluor's Docklands property with Ali Ebrahimi, the principal shareholder and president of Ersa Grae Corporation, a Houston-based real estate development company. Horne (primarily through Gibson) had previously represented Ersa Grae in unrelated transactions.

On June 12, Ebrahimi met with Fluor's representatives and made plans to visit the London site. Fluor sent cost estimates, architectural drawings, and artists' renderings of the completed project to Ebrahimi. At about the same time, Fluor and Horne entered a commission agreement identifying Horne as Ebrahimi's exclusive representative with regard to negotiations involving the Docklands property. Horne, however, had no written or oral agreement with Ebrahimi or Ersa Grae regarding the Docklands property and Ebrahimi never told anyone at Fluor that Horne was authorized to act on his behalf. Ebrahimi never saw the Fluor-Horne commission agreement and did not know it existed.

In early July, Ebrahimi met with Fluor's representatives in London. Fluor emphasized the profit potential of the project and explained to Ebrahimi that

it could not, because of the LDDC restriction, immediately assign its interests in the Docklands project and that any agreement would have to provide for Ersa Grae's purchase of the completed project and the land lease. While in London, Ebrahimi learned that the specific configuration of the Docklands project was already set, permits for the architect's plans had already been approved by the LDDC, and fixed price bids consistent with Fluor's extensive cost estimates were all in place. Essentially, all that remained to be done was for the project to be funded.

On July 11, 1986, Ebrahimi prepared a written offer for Ersa Grae's acquisition of the Docklands project, the "Proposed Heads of Agreement," and forwarded it to Horne for delivery to Fluor. Ebrahimi's offer contemplated the formation of a consortium, headed by Ersa Grae, to provide funding of £35 million (more than $50 million) to finance construction of the office building. As proposed by Ebrahimi, Ersa Grae would provide funding within 120 days of execution of the agreement, Fluor would construct the proposed office building for an amount not to exceed £27.875 million, and any savings between the actual cost of construction and the estimated cost would be shared by Ersa Grae and Fluor. Upon completion of the project, Fluor would assign its interests in the completed building and in the 200-year land lease to the consortium in accordance with a purchase and sale agreement to be drafted before Ersa Grae funded Fluor's construction costs.

Ebrahimi's offer permitted Fluor to lease space in the completed office building, at market rates, for as long as Fluor had office needs in London and gave Fluor "carried interest in the profits of the Consortium." It also provided that, once executed by both parties, the proposal would "constitute a firm agreement between the parties and [would] constitute the framework for subsequent detailed documents to be drafted by the attorneys." Finally, Ersa Grae was to post a $50,000 deposit which would become nonrefundable following a two-week period for Ersa Grae's review of the agreements Fluor had entered into regarding the Docklands project.

On July 15, Gibson and Turner (Horne) met with Joseph Trimble and Bruce Terrell (Fluor) at Fluor's offices in Irvine. Gibson and Turner presented Ebrahimi's offer to the Fluor representatives and the parties discussed it at length, including the terms of Fluor's lease in the completed building, Ersa Grae's financing, and the amount of Ersa Grae's deposit. A few days later, Turner (Horne) called Terrell (Fluor) and asked him "what was going on" with the offer. Terrell raised some objections to the offer and Turner suggested that Fluor revise the offer and send it to Horne.

Terrell and Trimble (Fluor) reviewed Ebrahimi's offer and made some handwritten revisions, and the modified offer became Fluor's counteroffer.

Among other things, Fluor's counteroffer eliminated Fluor's responsibility for construction of the project, substituting instead an obligation simply to "seek a bid to construct the Project." Fluor's counteroffer deleted the provision for the parties to share in any savings between the estimated cost of construction and the actual cost and provided instead that Ersa Grae would pay a £1 million premium to Fluor upon assignment to the consortium of the completed project and land lease. Minor changes were made to the original terms for Fluor's lease of space in the building and to Ersa Grae's deadline for funding the project.

On July 24, Fluor's counteroffer was sent to Horne and Horne, in turn, sent it to Ebrahimi. Ebrahimi immediately called Turner and Gibson (Horne) to arrange a meeting with Fluor to discuss the revisions. While all this was going on, Fluor continued to negotiate with National Leasing, a fact known to Ebrahimi. On July 29, Ebrahimi, Gibson and Turner met with Trimble and Terrell at Fluor's Irvine offices to discuss a number of specific provisions of Fluor's counteroffer. After about an hour, Trimble and Terrell said an internal company emergency required them to adjourn and Ebrahimi was told Fluor would contact him the next day. Although Ebrahimi was willing to sign Fluor's counteroffer on July 29, it was not executed when the meeting adjourned.

At no time during the July 29 meeting did Ebrahimi say he was unwilling to accept Fluor's counteroffer nor did anyone from Fluor tell Ebrahimi that Fluor had withdrawn its counteroffer. Following the July 29 meeting, however, Fluor decided to enter into an agreement with National Leasing instead of Ersa Grae.

At about 10 a.m. on July 30, Ebrahimi tried to call Fluor to "find out what was going on" but he was unable to reach Trimble or Terrell. At about the same time, Terrell (Fluor) called Turner (Horne) and told Turner that Fluor was accepting an offer from another party and that Ersa Grae was invited into a "backup" position.[1] Notwithstanding Terrell's (Fluor) call to Turner (Horne), Turner and Gibson called Ebrahimi at 10:20 a.m. to tell him they had just talked to Fluor, that Fluor was anxious to conclude the agreement with Ersa Grae, and that the Fluor deal was still alive. Ebrahimi told Turner and Gibson to tell Fluor he accepted its counteroffer and would send the signed counteroffer to Fluor that day. At 10:30 a.m., Trimble (Fluor) called Nigel Hancock at Fluor's London office and instructed Hancock to accept an offer then pending from National Leasing.

At about 2:30 p.m., Ebrahimi gave an envelope containing the signed Fluor counteroffer to his secretary and told her to "messenger" the document

---

[1]The testimony about what was said at any time on July 30 was conflicting. The facts set out in the text are derived from special verdicts rendered by the jury.

to Fluor. Although Ebrahimi did not enclose the $50,000 deposit required by the terms of the counteroffer, he did within the next few days try to make arrangements to forward $50,000 to Fluor. The agreement was in any event silent as to the precise time and manner for the deposit to be made.

Throughout the afternoon of July 30, the Fluor representatives continued to talk to the Horne brokers. At 4 p.m., Terrell (Fluor) called Turner (Horne) and reconfirmed that Fluor had committed to "go with the other prospect." Turner and Gibson again phoned Ebrahimi and Ebrahimi told the brokers the counteroffer was on its way to Fluor's offices. At no time on July 30 did anyone from Fluor or Horne tell Ebrahimi that Fluor had closed a deal with another party.

Over the next few days, Ebrahimi started the process to obtain financing and to form the consortium. It was not until August 5 that Ebrahimi first learned (from the Horne brokers) that Fluor refused to go forward with the contract and had instead decided to sell the project to another buyer. On August 29, Ersa Grae filed suit against Fluor. Following a series of pretrial proceedings, one cause of action for breach of contract proceeded to a bifurcated trial, with the issues of contract formation and breach tried in phase I and the damage issues tried in phase II.

At the conclusion of phase I on March 3, 1989, the jury returned six special verdicts finding, among other things, that Fluor had communicated a revocation to Horne before Ersa Grae placed the signed counteroffer in the hands of the messenger but that Horne was not acting as Ersa Grae's agent during the Docklands negotiations and that Horne had not communicated Fluor's revocation to Ersa Grae. The jury expressly found that Fluor's counteroffer, signed by Fluor and Ersa Grae, constituted a contract between the parties.

The trial court dismissed the jury and scheduled phase II to commence in June 1989. On May 19, 1989, however, Fluor moved for a continuance of phase II, requesting leave to conduct discovery for a possible motion for a mistrial on the ground that, during phase I, the jury was misled to believe that, at the time of trial, Gibson was still a Horne broker and, as such, an independent witness—when in fact he was at that time involved in a number of transactions with Ebrahimi. The trial court granted a continuance and discovery was conducted over the next 10 months. On March 20, 1990, Fluor filed its motion for a mistrial, submitting evidence that Gibson and Ebrahimi had strong business and financial relationships at the time of trial. On April 5, 1990, the trial court denied Fluor's motion for a mistrial.

Fluor then filed several offers of proof and a brief on the issues of causation and speculative damages, asserting Ersa Grae had suffered no

damages because it could not have performed or because, if it had performed, it would have lost money on the project. The trial court ruled that Ersa Grae need not prove it was ready, willing and able to perform its contractual obligations and the phase II trial of damages began on June 19, 1990.

Following the presentation of evidence, the trial court instructed the jury and on June 28, 1990, the jury returned a verdict against Fluor for £6.6 million. After converting the verdict to dollars and adding prejudgment interest and costs, the trial court fixed the award in favor of Ersa Grae at $13,777,493.

Fluor moved for new trial and for judgment notwithstanding the verdict. The trial court conditionally granted a new trial unless Ersa Grae agreed to a remittitur to £1.6 million but rejected Fluor's remaining contentions and denied the motion for judgment notwithstanding the verdict. Ultimately, the trial court entered judgment against Fluor for $3,373,863.03, including prejudgment interest and costs. Fluor appeals from the judgment and from the order denying its motion for judgment notwithstanding the verdict. Ersa Grae cross-appeals from the order reducing the judgment.

## FLUOR'S APPEAL

### I.

The fundamental issue addressed during phase I was whether Fluor effectively communicated its notice of revocation to Ersa Grae before Ersa Grae communicated its acceptance to Fluor. The jury found that although Fluor communicated its notice of revocation to *Horne* prior to Ersa Grae's communication of its acceptance to *Fluor*, Horne was not Ersa Grae's agent and it did not, in any event, relay Fluor's revocation to Ersa Grae.[2] ▓ To attack these findings, Fluor contends it did not have a fair trial because Ersa Grae "misrepresented" its relationship with Gibson in order to promote the appearance that Gibson was testifying as an "independent witness." We disagree.

Ersa Grae's witnesses (Ebrahimi, Turner and Gibson) testified with precision that, *during 1986*, Gibson had no connections with Ersa Grae other than

---

[2] The rules of offer, acceptance and revocation are not disputed. An offer is revoked when notice of the revocation is communicated to the offeree before the offeree's acceptance is communicated to the offeror. (Civ. Code, § 1587, subd. 1.) Both revocation and acceptance can be communicated by any usual and reasonable mode and notice of revocation or acceptance is complete when placed in the course of transmission to the recipient. (*Bellasi* v. *Shackelford* (1962) 201 Cal.App.2d 265, 267-268 [19 Cal.Rptr. 925]; Civ. Code, §§ 1582, 1583.)

All further statutory references are to the Civil Code.

a series of previous business deals. Gibson was described as a "Horne broker" and no reference was made to the fact that, by the time of trial, Gibson had substantial ties to Ersa Grae and arguably stood to profit if Ersa Grae prevailed at trial.

According to Fluor, Ersa Grae exceeded the bounds of proper advocacy and, through some kind of duplicity, misled the trial court and the jury by failing to volunteer that, although Gibson was "independent" at the time of the events surrounding the Docklands transaction, his independence did not continue up to and through the time of the trial. (See *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 871 [135 Cal.Rptr. 647 [558 P.2d 545].) In our view, Ersa Grae did nothing wrong. Fluor defended on the ground that an agency relationship existed between Ersa Grae and Horne (if it did, Fluor's communication of its revocation to Horne would have constituted an effective notice of revocation to Ersa Grae) and it was therefore to be expected that Ersa Grae would try to distance itself from Horne and its representatives. Ersa Grae's witnesses had no obligation to volunteer information explaining Gibson's current relationship to Ersa Grae, particularly in light of Fluor's failure to ask the most basic questions of Gibson—for example, "Where do you work today?"

## II.

Fluor next contends that, as a matter of law, its notice of revocation to Horne prevented Ersa Grae from accepting Fluor's counteroffer because the evidence indisputedly established that Horne was the "normal means of communication" between Fluor and Ersa Grae. In essence, Fluor contends its notice of revocation was effective immediately upon its communication to Horne without regard to whether Horne was Ersa Grae's agent and without regard to whether that notice was subsequently relayed to Ersa Grae. We disagree.

If Horne was Ersa Grae's agent, Fluor's notice to Horne of Fluor's revocation of its counteroffer would have been effective as a direct notice to someone authorized on behalf of the offeree to accept such notice. (*Bellasi* v. *Shackelford, supra,* 201 Cal.App.2d at pp. 267-268.) Similarly, if Horne (even though it was not Ersa Grae's agent) had relayed Fluor's notice of revocation to Ersa Grae, actual notice of revocation would also have been effective. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 170, p. 186 [indirect notice from a reasonable source indicating to the offeree that the offeror has revoked its offer is effective]; see also Rest.2d Contracts, § 43.) These rules are irrelevant, however, in light of the jury's special verdicts finding no agency and no actual notice.

Undaunted, Fluor nevertheless contends that, as a matter of law, its notice to Horne was a "reasonable and usual mode" for the communication of offers, acceptances and revocations within the meaning of sections 1582 and 1587, asserting that the use of Horne was "the human and legal equivalent of a telegraph office or mailbox." Fluor offers no authority to support this rather astonishing proposition nor does it attempt to explain how notice to one's own agent who is not also the agent of the offeree and who does not communicate the notice to its intended recipient could ever suffice. We know of no such authority and therefore summarily refuse to adopt a rule which, by its own terms, is patently absurd. In any event, "mode" of communication refers to the medium used, not the messenger. (*Palo Alto Town & Country Village, Inc.* v. *BBTC Company* (1974) 11 Cal.3d 494, 500 [113 Cal.Rptr. 705 [521 P.2d 1097] [mail]; *Sam Finman, Inc.* v. *Rokuz Holding Corp.* (1955) 130 Cal.App.2d 758, 761 [279 P.2d 982] [telegraph]; *Morello* v. *Growers Grape Prod. Assn.* (1947) 82 Cal.App.2d 365, 371 [186 P.2d 463] [mail].)

## III.

Fluor next contends the executed counteroffer was nothing more than an "agreement to agree," with terms insufficiently certain to establish a binding contract. Specifically, Fluor contends the agreement failed to address three essential terms: the need for the LDDC's approval, the definition of "profits of the Consortium," and the terms of Fluor's lease. We disagree.

Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. (*Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272, 287 [55 Cal.Rptr. 610]; *Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 500-501 [227 Cal.Rptr. 318]; *Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675].) Stated otherwise, the contract will be enforced if it is possible to reach a fair and just result even if, in the process, the court is required to fill in some gaps. (*Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 817 [250 Cal.Rptr. 220].)

All material terms are sufficiently set forth. Under its plain language, upon execution of the agreement Ersa Grae was to provide funding of £35 million within a defined period, Fluor was to find a contractor to construct the building subject to approval by the LDDC and, upon completion of the building, Fluor was to transfer its interests in the building and land lease to the consortium in exchange for a £1 million premium.

Extrinsic evidence properly received at trial (*Hennefer* v. *Butcher, supra,* 182 Cal.App.3d at pp. 500-501) defeats Fluor's contention that the counteroffer was fatally uncertain because it failed to address the need for the

LDDC's approval of the Ersa Grae deal. It is undisputed that Fluor and Ersa Grae construed the LDDC agreement to prohibit a transfer of Fluor's interests until the project was completed and Ebrahimi's offer was drafted accordingly. Fluor's counteroffer also provided that Fluor would transfer the project and land lease upon the project's completion. Both documents reflect the parties' intent that Fluor would remain the LDDC's licensee "on paper" with the consortium acquiring the building upon its completion. The decision of these parties to avoid an express application for the LDDC's approval might have caused a problem for both of them with the LDDC—but it has nothing to do with the sufficiency of the contract as between Fluor and Ersa Grae.

Use of the phrase "profits of the Consortium" without further definition is equally irrelevant, as is the absence of detail concerning Fluor's rental payments for its lease of space in the completed building. Specific definitions and lease terms were to be the subject of subsequent documentation and the parties were obligated to complete the documentation in good faith. No more is required. (*Okun* v. *Morton, supra,* 203 Cal.App.3d at p. 817.)[3]

### IV.

Fluor next contends the trial court should have required Ersa Grae to prove, as an element of its case-in-chief, that it was ready, willing and able to perform and failed to do so only because Fluor repudiated the contract. Specifically, Fluor contends Ersa Grae should have been required to prove its ability to form the consortium and successfully fund the Docklands project and that Fluor, in turn, should have been permitted to present evidence to the contrary. We agree with Fluor and therefore reverse the award of damages and remand for a new trial solely on issues relating to damages.

As a general rule, the measure of damages for the breach of an obligation arising from contract is the amount necessary to compensate the party aggrieved for all detriment proximately caused by the breach or which, in the ordinary course of things, would be likely to result from the breach.

---

[3]The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms. (See *Clarke* v. *Fiedler* (1941) 44 Cal.App.2d 838, 847 [113 P.2d 275] [" 'Any other rule would always permit a party who has entered into a contract like this . . . to violate it, whenever the understanding was that it should be reduced to another written form, by simply suggesting other and additional terms and conditions. If this were the rule the contract would never be completed in cases where, by changes in the market, or other events occurring subsequent to the written negotiations, it became the interest of either party to adopt that course in order to escape or evade obligations incurred in the ordinary course of commercial business.' "]; see also, *Smissaert* v. *Chiodo* (1958) 163 Cal.App.2d 827, 830 [330 P.2d 98].)

(§ 3300.) As a corollary to this rule, no person can recover a greater amount in damages for the breach of an obligation than he could have gained had all parties fully performed. (§ 3358.)

Although it is true that an anticipatory breach or repudiation of a contract by one party permits the other party to sue for damages without performing or offering to perform its own obligations (§ 1440), this does not mean damages can be recovered without evidence that, but for the defendant's breach, the plaintiff would have had the ability to perform. (*Dickey* v. *Kuhn* (1930) 106 Cal.App. 300, 303-304 [289 P. 242] ["elimination of the necessity of an offer of performance does not dispense with the proof of ability to perform when that is made an issue in the case"].)

We reject Ersa Grae's contention that proof of the plaintiff's ability to perform is limited to actions for specific performance. *Dickey* v. *Kuhn, supra*, 106 Cal.App. 300, was an action for money damages, not specific performance. (See also *McDorman* v. *Moody* (1942) 50 Cal.App.2d 136, 140-141 [122 P.2d 639]; *S.P. Mill. Co.* v. *Billiwhack etc. Farm* (1942) 50 Cal.App.2d 79, 86-87 [122 P.2d 650].) As explained by Professor Corbin, in "an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a *judgment for damages* that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in *damages* for the defendant's non-performance or repudiation." (4 Corbin on Contracts (1951) § 978, pp. 924, italics added.)

Professor Williston agrees: " 'Where [one party] repudiates, there is no necessity for [the other party] to *allege* a tender, nor his readiness and willingness to perform. He must, of course, *prove* that he would have been able to [perform], for otherwise he will fail in his proof of *damages . . . .* ' " (5 Williston on Contracts (3d ed. 1961) § 669, p. 353, italics added; see also Rest.2d Contracts, § 254, subd. (1) ["A party's duty to pay *damages* for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise"]; 77 Am.Jur.2d, Vendor and Purchaser, § 518, p. 647 [in the case of an anticipatory repudiation of a contract *by a seller, the buyer's right to sue for damages* is not conditioned on any further performance by the buyer, provided it appears the buyer was ready, willing and able to perform]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) § 12.10, pp. 687-688 [if financing is contemplated, the buyer must be able to demonstrate the availability of financing]; 12 Am.Jur. Proof of Facts 2d, Anticipatory Repudiation, § 9, p. 196.)

Contrary to Ersa Grae's contention, our holding does not mean it was obligated in 1986, despite Fluor's breach, to put together the consortium and raise the money for financing the building. All we are saying is that evidence should have been presented by Ersa Grae to prove that, but for Fluor's breach, Ersa Grae had the ability (by way of Ebrahimi's contacts or otherwise) to form the consortium and fund the deal. Ironically, Ersa Grae *did* present some evidence of its ability to perform—but, unfortunately, the trial court refused Fluor's evidence offered to disprove this point and, of course, failed to present the issue to the jury.[4]

On retrial, Ersa Grae must present evidence sufficient to satisfy a jury that, but for Fluor's breach, Ersa Grae was ready, willing and able to perform as required by the contract. Fluor, of course, must be permitted to present evidence to persuade the jury that Ersa Grae would *not* have performed and that, therefore, Fluor's breach did not cause damage to Ersa Grae. Finally, this issue must be presented to the jury.

## V.

■ The final question presented by Fluor's appeal (which we reach because it will undoubtedly arise on retrial) concerns the proper measure of damages for Fluor's breach. Over Fluor's objection, the trial court instructed the jury that, "[u]nder the contract, the real property to be conveyed by Fluor was the completed office building and the two-hundred year land lease upon which the office building sits. . . ."

According to Fluor, this was error because it was not a correct definition of the "estate agreed to be conveyed" by Fluor to the consortium. The scope of "the estate agreed to be conveyed" is, of course, an integral part of the formula used to calculate damages in this situation. Under section 3306, the detriment caused by the breach of an agreement to convey an estate in real property is deemed to be the difference between the price agreed to be paid

---

[4]Ray Wilson, a Texas real estate consultant, testified about previous multimillion dollar joint ventures with Ersa Grae. Thad Bowman, who runs the Houston office of Kidder, Peabody & Company, testified that he had discussed the Docklands project with Ebrahimi and was seriously considering the project until he was told that Fluor had breached and there would be no deal with Ersa Grae. Gary Fowler, a California real estate consultant, testified that he has experience in United Kingdom real estate deals and that he previously worked with Ebrahimi on a $20 million project in Santa Monica. Fowler was interested in the Docklands project and was looking into financing when the deal fell through.

Fluor, in turn, offered to present evidence to the contrary, to show that further efforts by Wilson, Bowman and Fowler would not have been successful and that Ersa Grae would not have been able to form the required consortium or obtain the necessary financing at all and certainly not within the 60 days required by the agreement. The trial court refused to permit *any* evidence of this nature.

and the value of *"the estate agreed to be conveyed"* at the time of the breach, plus consequential damages according to proof and interest. Fluor contends that, instead of an office building and lease, Fluor agreed to convey only a "right to develop" the Docklands site and a "contingent lease interest" and that damage should have been measured by the fair market value of Fluor's interest in the Docklands property as of the date of the breach, less the amount Ersa Grae would have had to pay for Fluor's interest. We disagree.

The starting point for the transaction is the contract between Fluor and Ersa Grae. That contract recited, among other things, that Fluor "has entered into an agreement with the [LDDC] whereby [Fluor] has obtained an option to a 200 year lease on a 3.8 acre parcel of land on the Isle of Dogs, adjacent to West Indies Dock. The said option is hereinafter referred to as the Land Lease. Fluor has caused YRM Architects and Planners to design a 240,000 gross square foot office building on the said land. This building . . . is hereinafter referred to as the Project."

With those facts in mind, the parties unambiguously agreed that, "[u]pon completion of the Project, Fluor will assign its interest in the Land Lease and the Project to the Consortium for a 'premium' of £1 million. This obligation is irrevocable and shall be the subject of a Purchase and Sale Agreement to be prepared prior to funding."[5]

The trial court correctly interpreted Fluor's counteroffer as a contract to convey a completed office building and land lease and the instruction was therefore proper. It follows that Fluor's related contention—that the trial court improperly excluded portions of its expert's testimony concerning the value of comparable "bare sites"—must also fail. The comparable site analysis was properly excluded because the estate to be conveyed was not the bare Docklands land.

### Ersa Grae's Appeal

Ersa Grae's cross-appeal raises three issues. The first issue—that the trial court failed to state reasons for conditionally granting Fluor's motion for a new trial—is moot in light of our partial reversal and remand for retrial of the damage phase. The second and third issues—that there is no substantial evidence to support the trial court's conclusion that the jury's verdict included speculative lost profits but that, even if the award did include lost

---

[5] Contrary to Fluor's assertion, Fluor did not agree to convey a contingent interest in the Land Lease or Project. It very plainly agreed that only "[u]pon completion" of the building would it be obligated to transfer to the consortium both the Project and the Land Lease. Only the "Purchase and Sale Agreement" was to be done earlier.

profits, the verdict was correct because lost profits are properly recoverable in this case—are moot in light of the reasons for our partial reversal. While it is possible the latter issues may arise on retrial, it is equally possible they will not and we therefore see no need to offer guidance at this time.

## DISPOSITION

The findings that Fluor and Ersa Grae had an enforceable agreement which was breached by Fluor are affirmed. The judgment is reversed insofar as it fixes the amount of damages recoverable by Ersa Grae, and the case is remanded for retrial on all damage issues. Each party is to pay its own costs on appeal.

Spencer, P. J., and Devich, J., concurred.