Filed 3/26/13  T.L. v. Brentwood Union School Dist. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| T.L. et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>BRENTWOOD UNION SCHOOL DISTRICT et al.,<br><br>        Defendants and Respondents. | A133428<br><br>(Contra Costa County<br>Super. Ct. No. 1003226) |

        T.L, individually and on behalf of her minor son, N.L., sued the Brentwood Union School District (District) for, among other things, breach of contract and retaliation in violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq. (Unruh Act)).  On appeal, T.L. contends the trial court erred in sustaining the District's demurrer to her causes of action for breach of contract and Unruh Act violations.  We affirm in part and reverse in part.

## I.  FACTUAL BACKGROUND

        N.L. is a child eligible for services under the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq. (IDEA), based on his classification as "autistic-like."  He received services from the District for several years, beginning in 2005.  A dispute arose among the District, T.L. on behalf of N.L., and T.L. in her individual capacity, regarding those services.  On January 29, 2010, the parties entered into a Compromise and Release Agreement (Agreement) to resolve the dispute, and formalized

1

a new Individualized Education Plan (IEP) for N.L. that same day. The District's Board approved and ratified the Agreement on February 10, 2010. The agreement was to last two years, unless the family moved its residence outside the District's boundaries.

Under the IEP, services were to run from January 29 through July 31, 2010. The Agreement placed a monetary cap on services, and the District agreed to pay $23,500 for independent assessments, attorney fees, and missed occupational therapy. T.L. agreed to pay all other costs related to special education. As well, the Agreement specified that the District's obligation to fund IEP services was conditioned on continued residency within the District: "If, at any time covered by this Agreement, Parents and [N.L.] move their residence, as defined by California Government Code [section] 244,[1] outside the District's geographical boundaries during the 2009-2010 school year or 2010-2011 school year, the District's obligation to fund IEP services will immediately cease."

The Agreement also included a general release pursuant to which T.L. released and discharged the District "from any and all known or unknown rights, claims, demands, and causes of action pursuant to the Individuals with Disabilities Education Act, as amended, Section 504 of the Rehabilitation Act, and related California law (including, but not limited to: assessment, placement, program and services, compensatory education, reimbursement and attorney's fees) in connection with [N.L.'s] educational program including past, present and future claims . . . . , except that the parties reserve the right to seek enforcement of the Agreement . . . ."

---

[1] Government Code section 244 provides: "In determining the place of residence the following rules shall be observed: [¶] (a) It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose. [¶] (b) There can only be one residence. [¶] (c) A residence cannot be lost until another is gained. [¶] (d) The residence of the parent with whom an unmarried minor child maintains his or her place of abode is the residence of such unmarried minor child. [¶] (e) The residence of an unmarried minor who has a parent living cannot be changed by his or her own act. [¶] (f) The residence can be changed only by the union of act and intent. [¶] (g) A married person shall have the right to retain his or her legal residence in the State of California notwithstanding the legal residence or domicile of his or her spouse."

Several months into the Agreement T.L. filed a complaint with the California Department of Education (CDE) on allegations the District was not complying with the terms of the Agreement and the IEP. CDE apparently made several findings against the District and ordered corrective actions.

Meanwhile, toward the end of June 2010, the District asked T.L. for proof of residency. On September 7, 2010, the District notified T.L. that the Agreement was " 'no longer in effect' " due to her breaches. The District advised T.L. on September 24 that its investigation revealed she was no longer a resident. On October 1, 2010, the District notified T.L. of the right to appeal the residency finding and provided a copy of the Board's residency policy. Additionally, District personnel provided reasons for the residency determination.

The residency policy states: "If the Superintendent or designee, upon investigation, determines that a student's enrollment is based on false evidence of residency, he/she shall revoke the student's enrollment. Before any such revocation, the parent/guardian shall be sent written notice of the facts leading to the decision. This notice shall state the parent/guardian's right, within 10 school days, to schedule a meeting with a hearing officer to inspect supporting documents, rebut district evidence, question any district witnesses, . . . on the student's behalf. . . . [¶] If the parent/guardian fails to schedule the above meeting, the student's enrollment shall be revoked 11 school days after the date of the notice." Further, if the parent does meet with the hearing officer, the parent has the right to appeal the hearing officer's decision to the Board, with rights to be represented, rebut district evidence, question any district witness, and present documentary evidence and witness testimony. The Board's decision is final.

T.L. received a letter from the District on October 20, 2010, informing her that the District "was terminating services for N.L."

In November 2010, T.L. sued the District and three administrators alleging breach of the Agreement and other causes, and filed a first amended complaint following the District's demurrer. In its tentative ruling on the District's demurrer to the first amended complaint, the trial court indicated it would sustain the demurrer without leave to amend,

3

holding that T.L. failed to exhaust the District's administrative process concerning its residency decision and failed to plead the futility exception to the exhaustion requirement. After oral argument the court permitted T.L. leave to amend, but made it clear it had "already ruled on the exhaustion issue and the futility exception."

Ruling on the District's demurrer to the second amended complaint, the trial court overruled the demurrer to the causes of action for breach of the Agreement and breach of the implied covenant of good faith and fair dealing, but only as to breaches that occurred between March 2010 and August 2010—i.e., prior to termination of the Agreement. The court held that T.L. could not challenge the District's termination of services to her son based on the District's residency determination, because she failed to exhaust her administrative remedies. It sustained the demurrer without leave to amend to the third and fourth causes of action for declaratory relief because both causes sought a judicial determination of the parties' rights and obligations concerning termination of N.L's services due to the District's residency finding. As to these causes of action, T.L. similarly failed to exhaust administrative remedies with respect to that determination. As to the remaining causes of action, the demurrer was sustained without leave to amend for varying reasons: the fifth cause of action for declaratory relief because it did not frame a present, active controversy; the sixth cause for retaliation because defendants were immune under the Tort Claims Act; the seventh cause for violation of Civil Code section 52.1 because T.L. failed to plead the essential elements of such a claim; and the eighth claim for violation of the Unruh Act because the general release precluded the claim.

On appeal T.L. seeks reversal of the trial court's orders limiting her breach of contract claims to the period March 2010 to August 2010 and barring her from arguing that the District's appeal procedure was inadequate. As well, she appeals the order sustaining the demurrer to the Unruh Act cause of action.

## II. DISCUSSION

### A. Standard of Review

When reviewing the sufficiency of a complaint against a demurrer, we treat the demurrer as admitting all properly pleaded material facts, but do not assume the truth of

4

deductions, contentions, or legal conclusions. As well, we liberally construe the pleading in the interest of substantial justice between the parties, affording the complaint a reasonable interpretation and reading the allegations in context. (*Arce v. Kaiser Foundation Health Plan, Inc*. (2010) 181 Cal.App.4th 471, 481.) Further, when the demurrer is sustained, we determine de novo if the factual allegations are sufficient to state a cause of action under any legal theory. (*Id*. at p. 482.)

B. *Breach of Contract Claims*

T.L. maintains that the trial court arbitrarily restricted claims to the period March 2010 to August 2010, contrary to allegations in the second amended complaint. Specifically, that pleading alleged that on August 23, 2010, N.L. began attending Springstone School and the District to date had not reimbursed T.L. for her $3,000 deposit. (The second amended complaint was filed in May 2011.) Additionally, the District failed to pay under the terms of the Agreement for Springstone, from October 2011 and thereafter.

The District counters that the initial IEP, which was incorporated into the complaint, expired on July 31, 2010. However, the Agreement is not limited to paying for services related to that IEP. Further, the District claims T.L. did not cite any breaches occurring after July 31, 2010, but that is not the case, as shown above. The District additionally argues that by September 24, 2010, its investigation revealed T.L. was no longer a resident, and under the terms of the Agreement, its obligations immediately ceased. However, the complaint states that the District notified T.L. on October 1, 2010, that she had a right to appeal the residency determination within 10 days and provided her with a copy of its residency policy. That policy provides that a student's enrollment is revoked 11 school days after the date of notice of the right to schedule a meeting with a hearing officer following a residency determination. By the District's own alleged actions, N.L.'s enrollment was not revoked until expiration of the 11 day period—in other words on or about October 12, 2010.

On appeal, T.L.'s argument is this: the second amended complaint alleges material breaches of the contract that occurred *prior to* October 12, 2010, the date it

asserts the District's termination of residency was effective. We conclude that the trial court erroneously limited T.L.'s contract-related claims to a period ending August 2010.[2] Accordingly, on this narrow issue we must reverse.[3]

## C. Failure to Exhaust Administrative Remedies

T.L. next challenges the trial court's determination that she failed to exhaust her administrative remedies with respect to the District's residency determination.

"A demurrer may properly be granted based on the failure to adequately plead an exhaustion of administrative remedies. (*Kirkpatrick v. City of Oceanside* (1991) 232 Cal.App.3d 267, 277, 283.) A plaintiff must exhaust the administrative remedies available before resorting to the courts. The issue is one of jurisdiction. (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293.) The exhaustion requirement applies to statutory administrative remedies and also to internal grievance procedures of public and private organizations. (*Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 474–477; *Moreno v. Cairns* (1942) 20 Cal.2d 531, 535. . . .)" (*Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476, 482.)

The parties agree that Education Code section 48200 establishes the general rule under California law that the school district responsible for the education of a child between the ages of 6 and 18 is the district in which the child's "parent or legal guardian" resides. (*See Katz v. Los Gatos–Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 57 ("Section 48200 embodies the general rule that parental residence dictates a pupil's proper school district.") The parties disagree, however, about how

---

[2] We have not identified any allegations in the second amended complaint of breaches occurring prior to March 2010.

[3] Though the parties argue at length about whether T.L. had the ability to perform under the Agreement and whether the District's breach and repudiation of the Agreement excused T.L.'s performance, these issues, to the extent they concern matters occurring before October 12, 2010, are factual questions to be determined on remand. (See *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1276; *Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 626.) As we shall explain *post*, T.L.'s claims arising out of the District's conduct after October 12, 2010, are barred due to her failure to challenge the District's residency determination.

residency should be determined. The District maintains that T.L. was obligated to exhaust her administrative remedies by challenging its residency determination as set forth in its residency policy.

Conversely, T.L. argues that the District's internal residency procedures cannot be utilized to "trump" federal and state procedures for removing a disabled child's special education rights. She maintains that the gravamen of her claims has nothing to do with residency; rather the issue of residency is a defense raised by the District to avoid its obligations under the Agreement. As well, T.L. asserts that even if exhaustion was required here, exhaustion would have been futile because she was not provided with a fair and adequate opportunity to challenge the residency determination. T.L. complains that the District refused to produce the witnesses she wanted to question and that the District intended to call a witness who also would have served as the hearing officer.

Preliminarily, we agree with T.L. that residency has nothing to do with the claims she raised regarding the District's alleged breaches of contract. Residency does not involve a programmatic change in the IEP or an assessment of the student's disability to evaluate qualification for special education service. Rather, residency is a basic requirement for all educational services, including students with special education needs. (See Ed. Code, § 48200; *Katz v. Los Gatos–Saratoga Joint Union High School Dist., supra,* 117 Cal.App.4th at p. 57.) Although T.L. did not sue under the IDEA, she appears to argue that IDEA regulations should govern her breach of contract claim. Even if true, it would not affect the residency issue. For example, in *Roxbury Township. Bd. of Ed. v. Milford Bd. of Ed.* (N.J. 1995) 662 A.2d 976, the court observed that residency may be relevant to the question of which district would be obligated to pay for compliance with the IDEA, but residency was not governed by the IDEA; it was "a matter of local law." (*Id.* at p. 982.) Here, "local law" provides that children 6 to 18 years old who go to public school must attend schools in the district in which their parents or guardians reside. (Ed. Code, § 48200.) Children whose parents live outside a school district may not attend school in that particular district. (*Anselmo v. Glendale Unified School Dist.* (1981) 124 Cal.App.3d 520, 522-523; 67 Ops.Cal.Atty.Gen. 452 (1984).) T.L. cites no

7

authority nor have we found any cases supporting the proposition that the IDEA requires a school district to provide special education services to students who reside outside its borders.  There simply is no basis for holding that the determination of residency under the IDEA or the Education Code should be different from the ordinary determination of residency.  (*Union School Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1525.)  T.L. provides no authority exempting N.L. from the residency requirement or the District's policies and procedures for enforcing that requirement.

Once the District notified T.L. that it was revoking N.L.'s enrollment, she was required to follow the District's procedures for challenging its residency determination or suffer the consequences.  Inasmuch as T.L. failed to appeal the District's decision, she cannot now challenge this determination.  While it is true that the rule requiring exhaustion of internal administrative remedies does not apply where an administrative remedy would be futile (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 89),  "[t]he futility exception . . . is a very narrow one" (*County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62, 77).  "In order to invoke the futility exception, a plaintiff must show ' "that the [agency] has declared what its ruling will be on a particular case." '[Citation.]  A plaintiff need not pursue administrative remedies where the agency's decision is certain to be adverse.  [Citation.]"  (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1430.)  T.L. has failed to demonstrate that such futility exception has any application here.

*D.  Unruh Claims*

T.L. maintains that the trial court erroneously determined that the release barred her Unruh Act claims.  This matter is one of contractual interpretation, making our review de novo, where, as here, there is an absence of conflicting extrinsic evidence.  (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866.)

Interpretation of a release or settlement is governed by the same legal principles generally applicable to all contracts.  (*General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 439.)  Thus, we look first to the literal terminology of the contract itself to determine and to effectuate the intention of the parties.  (Civ.Code, §§ 1638, 1639;

*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38.) We enforce this outward expression of the agreement, rather than a party's subjective unexpressed intention. (*Edwards v. Comstock Insurance Co.* (1988) 205 Cal.App.3d 1164, 1169; see also *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1167.)

The relevant language of the release in the instant case is as follows: "Parents . . . hereby fully release and discharge the District . . . from any and all known or unknown rights, claims, demands, and causes of action pursuant to the [IDEA], as amended, Section 504 of the Rehabilitation Act, and related California Law . . . *in connection with N.L.'s educational program including past, present and future claims,* through the end of the 2011 extended school year, except that the parties reserve the right to seek enforcement of the Agreement . . . . [¶] In the event that one party breaches the Agreement . . . the non–breaching party is entitled to all remedies legally available to them, including attorney fees incurred." (Italics added.)

Although releases of future claims do not categorically violate public policy, T.L., relying on Civil Code section 1668, asserts that interpreting the instant release as applying to unknown future claims improperly exempts the District for liability for its intentional wrongful acts in violation of the Unruh Act. Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Taken literally, this statute would prevent settlement of most civil litigation, in contradiction of the strong public policy in favor of settlement. Public policy does not oppose "private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . ." (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 101.) The parties, while represented by counsel, expressly contracted to bear the risk of loss of unknown claims. Civil Code section 1668 does not apply to invalidate this Agreement as to T.L.'s future Unruh Act claims.

The cases cited by T.L. do not alter our conclusion that the general release is valid. For example, in *Baker Pacific Corp. v. Suttles* (1990) 220 Cal.App.3d 1148, 1153, an asbestos removal company required its employees to sign a release for fraud and intentional acts as a condition of employment. In finding the release invalid under Civil Code section 1668, the court explained that: "This 'pistol to the head' approach to an employment relationship, where hiring is conditioned on acceptance of statutorily proscribed terms, is not acceptable to us." (*Id.* at p. 1155.)

Similarly, inapposite is *Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224, 226-227 (*Health Net*), which involved a contract between the Department of Health Services and a contractor that contained a clause purporting to prohibit damages with respect to any violation of statutory or regulatory law. The appellate court deemed the exculpatory provision to be unenforceable as against public policy under Civil Code section 1668. (*Id.* at p. 227.)

*Baker* and *Health Net* are distinguishable from the instant case in several important respects. Here, the release was not a contract of adhesion, forcing T.L. to take it or leave it. Nor did the release purport to exempt the parties from any statutory or regulatory provisions. Finally, neither *Baker* nor *Health Net* involved a negotiated settlement agreement. "It is important to recognize there is a strong public policy favoring settling of disputes. [Citation.] 'We note that there is a well-established policy in the law to discourage litigation and favor settlement. Pretrial settlements are highly favored because they diminish the expense of litigation.' [Citation.] Additionally, "Freedom of contract is an important principle, and courts should not blithely apply public policy reasons to void contract provisions.' " (*Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 745.)

T.L. also maintains that even if the release is not proscribed by Civil Code section 1668, her Unruh Act claim is excluded from the release because it is "limited only to claims ' in connection with [N.L.'s] educational program . . . .' " T.L. cites no authority supporting her interpretation, but merely restates the language from the release provision. The oft-stated goal of contract interpretation is " 'to give effect to the parties' mutual

10

intentions as of the time of contracting . . . .  Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further.'  [Citation.]"  (*Shaw v. Regents of Univ. of California* (1997) 58 Cal.App.4th 44, 53.)  The plain language of the release states that T.L. agreed to fully release all claims she had "in connection with N.L.'s educational program including past, present and future claims . . . ."  Yet, the second amended complaint alleges that District retaliated against her because of her "advocacy . . . about her son's special education program and accommodations."  This allegation is plainly a claim made "in connection with N.L.'s educational program . . . ."  The existence of T.L.'s retaliation claim is inherently dependent on her son's educational program.  Accordingly, T.L.'s retaliation claim necessarily falls within the scope of the claims surrendered in the release.

### III. DISPOSITION

For the reasons stated, the judgment is affirmed in part, and reversed in part.  On remand, T.L. is entitled to proceed with her breach of contract claims occurring before October 12, 2010.  Each party to bear their own costs on appeal.

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.

11