Filed 7/26/16  Ghazal v. Wiederkehr CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALBERT GHAZAL et al., | D069670 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. RIC1216461) |
| JEFF F. WIEDERKEHR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Craig G. Riemer, Judge.  Affirmed.

Clayson, Mann, Yaeger & Hansen and David R. Saunders for Defendant and Appellant.

Lizarraga Law Firm and Frank J. Lizarraga, Jr., for Plaintiffs and Respondents.

Jeffrey Wiederkehr (Jeff) and his ex-wife, Carol Annelle Wiederkehr (Annelle), entered into a written agreement to sell their home for $350,000 to Annelle's best friend,

Donna Scharf (Donna) and Donna's fiancé, Albert Ghazal (Albert).[1]  But after Jeff, who was in the business of "flipping homes," received two cash offers over $450,000 from others, he cancelled escrow and later sold the house to someone else.

In the ensuing litigation, Annelle settled before trial and the case proceeded against only Jeff.  By special verdict, the jury found against Jeff on breach of contract and breach of the implied covenant of good faith and fair dealing, and awarded Donna and Albert $125,000 total damages.  Subsequently, the court awarded them $215,351.50 for attorney fees.

Jeff appeals from the judgment and the order denying his motion for judgment notwithstanding the verdict, asserting: ( 1) the special verdict is irreconcilably inconsistent; (2) the judgment is not supported by substantial evidence; and (3) Donna and Albert's failure to plead excuse for their nonperformance bars their recovery.  We affirm.

---

[1]  At trial and on appeal, the parties refer to each other by their first names.  For clarity, we do the same.

2

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *The Parties*

In 2012 Donna and Albert had being living together about 10 years and had one child. They lived "[a]round the corner, not far at all" from a home owned by Jeff and Annelle on Vixen Trail Road in the City of Corona.

The two couples were friends and even took vacations together. Donna and Annelle became "very close" friends and communicated with each other on a "constant basis."

Donna and Albert "loved" the Wiederkehr's Vixen Trail home. It was big, had a pool, and a great view. They told Jeff and Annelle, "If you guys ever do sell your house, we're interested."

In 2012 Jeff and Annelle divorced. At the time, Jeff was in the business of buying and reselling residential real estate, which he described as "flipping homes." As part of their marital dissolution proceedings, Jeff was responsible for selling the Vixen Trail home, and Annelle was required to cooperate in that effort.

B. *The Purchase Agreement and Financing Agreement*

In December 2011 Annelle told Donna and Albert she would sell them the Vixen Trail home. Albert sent an e-mail to Annelle stating, "I want to thank you from the bottom of my heart for giving me and my family the opportunity to be able to buy the

---

2 Certain of the facts recited were disputed at trial; nevertheless, as is required by the standard of review applicable to Jeff's substantial evidence argument, we recite the facts in the light most favorable to the judgment. (See *Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 926, fn. 1.)

[V]ixen [T]rail house. I promise you I will do whatever it takes to make sure that you are secure and happy with this deal."

In January 2012 Jeff and Annelle gave Albert and Donna permission to move into the house. Handing Albert the house keys, Annelle said, "This house is yours and I'm going to do whatever it takes to get it for you guys." With Annelle and Jeff's permission, in mid-February 2012 Albert, Donna, and their child moved into the Vixen Trail home. They were not supposed to pay rent. Albert and Donna leased their former house to a family under a two-year lease because they considered the Vixen Trail house their new home.

In March 2012 Annelle told Donna the purchase price was $350,000 and that she (Annelle) would finance the entire amount. Donna had "no doubt" that Annelle had the financial capability to loan $350,000. There was no negotiation over price. Jeff proposed the $350,000 price and Donna and Albert thought it was fair. Even though the house had a leaky roof and history of black mold, that did not matter to Albert and Donna. As Donna testified, "We loved the house."

Albert hired a lawyer to write a purchase agreement. On April 18, 2012, Albert e-mailed the purchase agreement to Jeff for his review and signature. The draft agreement provided for a closing in May 2012; however, Albert was hopeful of closing sooner because it was a cash sale and Annelle was providing the financing.

On April 27, 2012, Annelle sent an e-mail to Albert and Donna about the draft purchase agreement and financing. The draft purchase agreement provided for title vesting in only Albert's name. Annelle insisted that title also be held in Donna's name.

4

Annelle also proposed these financing terms:  "[Z]ero down loan at 8 percent for $350,000.  24 month pre-payment penalty of 10 percent.  After 24 months NO pre payment penalty and full payment is encouraged.  The lender(me) will have option to have loan called in and paid [*sic*] balance paid in full at 60 months or to continue on a year to year basis at agreed upon rate based on 30 year loan."  Annelle stated that once the purchase agreement was changed to vest title also in Donna, she would have an attorney "create loan documents and do a lender title paperwork."

Albert and Donna agreed to these financing terms.  They also agreed to modify the purchase agreement to add Donna's name to title.

On April 30, 2012, Albert sent a revised purchase agreement to Jeff, stating, "We made revisions as you requested . . . .  Please let me know when I can get the signed agreement so I can send it to the escrow company."

When Jeff failed to respond by May 17, 2012, Donna e-mailed the purchase agreement to him again; however, apparently she sent the first version, rather than the revised version (with her name on the title).

After Donna sent the revised purchase agreement to Jeff, he signed and returned it on May 29, 2012.  Annelle signed the agreement by early June.

The fully executed purchase agreement (Agreement) states it is made "this __ day of April, 2012" between Jeff and Annelle as "Seller" and Albert and Donna as "Buyer".  The closing date is "on or about May __, 2012 or at a time and place Seller and Buyer agree upon at a later date."  The purchase price is $350,000. Paragraph 7 provides,

5

"Possession and occupancy shall be delivered to Buyers on or before thirty (30) days from the time or date of execution of this agreement."

Although the Agreement provides escrow to close on "May __, 2012," and the parties did not execute the Agreement until after May 29, 2012, paragraph 10 provides, "Time is of the essence."  There are no provisions in the Agreement about paying rent while awaiting close of escrow.

C.  *Jeff Demands $10,000 "Rent" and Refuses to Sign Escrow Documents Until Donna and Albert Pay It*

On June 3, 2012—five days after signing and returning the Agreement—Jeff sent an e-mail to Donna and Albert stating, "I know you guys have lived in the house for at least 5 months without paying rent.  I think $2000 a month is not a bad rent for that period of time—$10,000.[3]  This needs to be taken care of."  Jeff added, "[T]he price we are selling the house to you [*sic*] is far below the current market prices.  Please let me know if you want to do what is necessary to take ownership of the house."  Jeff ended the e-mail by stating, "I would prefer to take the house and put it into my portfolio and rent it out (I can get close to $3K) but I gave you guys my word I would sell it to you at the price we agreed to."  Jeff asked Donna and Albert to let him know "if we can get this done by July 4th.  If not, then we should look at other options."

This was the first time Donna had heard any request for rent.  Albert replied the next day, assuring Jeff that "we will be taking ownership" and stating, "[o]nce we have received all documentation we will be able to close escrow by June 20th."

---

3      Unless otherwise indicated, all dates are in the year 2012.

However, Jeff refused to sign and deliver his escrow documents unless and until Donna and Albert paid the $10,000 he was demanding as rent. On June 11 Jeff sent an e-mail to Donna and Albert stating, "I have signed all the documents. Please send me confirmation of the rent for the past months and I will send over the docs."

Two days later, Jeff sent another e-mail, stating, "Please realize that 350[K] is far below market price for our home. I have purchased 4 homes in the past 30 days in [C]orona and I am very familiar with rents and prices. As I said before, I want the house. . . . You guys have to pay rent for the time you occupied the house. It's only fair. [¶] Honestly, I do not want to get into negotiations with you and [A]lbert. I believe [I']m being more than fair with you guys."

Donna and Albert did not believe they owed rent. Initially, in January 2012, the plan was for them to lease and then buy the home. But after Annelle offered to finance the entire purchase price, a lease was not needed. Donna testified the subject of rent never was raised again. Albert, Donna, and their child moved into the property with Jeff and Annelle's permission. There was no discussion about rent. To the contrary, the Agreement states that possession and occupancy was to be delivered no later than 30 days after the Agreement was executed. At trial, Jeff admitted he was "not sure" if the Agreement supported his demand for rent.

Nevertheless, Donna and Albert were concerned Jeff would not sign escrow papers if they did not pay his demand. On June 15 Donna sent an e-mail to Jeff, offering to pay $6,000 instead of the $10,000 demanded, at the rate of $500 per month.

7

On June 18 escrow sent an e-mail to Jeff, asking him to deliver his signed escrow papers and grant deed. On June 21 escrow sent another e-mail to Jeff, reiterating, "We still have not received your opening package and deed back yet. Please advise ASAP!" Jeff still did not respond. On June 25 escrow sent Jeff another e-mail, stating, "Jeff, [¶] please advise on the status of the deed and seller's opening package ASAP!" At trial, Jeff conceded he was refusing to deliver his escrow papers until Donna and Albert paid the $10,000 "rent."

On July 2 Donna sent an e-mail to Jeff, stating, "[T]he escrow company has not received the signed documents from you and has also been sending emails without any response. . . . [¶] Please sign and return docs so we can move forward. We are ready to close."

The next day, July 3, Donna sent an e-mail to Jeff, asking if she could pay $5,000 now and $1,000 per month for five months. Later that day, she increased her offer to $8,000, with half paid now and the rest at $1,000 per month. She offered to bring a cashier's check to Jeff and "pick up signed docs from [yo]u so we can take them to escrow so we can close."

But Jeff rejected both proposals, stating, "I'm pretty well done with discussions on this. I'm sorry, but either we go with the cashiers check for $10,000 and I'll send the escrow documents over or I'll take the property at the end of the month." He insisted that he had been "very fair" and even though the Agreement said nothing about paying rent, Jeff insisted he had "not changed any conditions with you guys since we started."

8

On July 5 Jeff sent a text message to Donna, stating, "I really want to keep the house. I'm selling it to you for at least 50-75K under market. Please stop negotiating with me. Let me know today if you want/can get a cashiers check for 10K and I will sign the escrow docs."

This was now the third time Jeff had said the $350,000 contract price was far below current market value. The same day, Donna replied she and Albert would pay the $10,000.

On July 11 Donna informed Jeff she had the $10,000. It took another five days, until July 16, for Jeff to make himself available for Albert to personally deliver the cashier's check.

Despite receiving the $10,000, Jeff did not sign and deliver escrow papers until July 27. That day, Jeff sent a text to Donna, asking, "When are you guys going to close," complaining, "I had to pay the mortgage for July and August." On July 28 Donna replied, "As l[o]ng as everyth[i]ng [is] signed correctly, [t]hey said it should be about a week after they receive papers."

C. *Annelle Reneges on Financing*

On August 7 Annelle sent a text message to Jeff, stating she did not want to finance the purchase because she needed the money for another real estate venture. Jeff forwarded Annelle's text to Donna, stating, "Please make sure Albert knows that [A]nnelle is giving both of you a big F U."

This was the first Donna had heard that Annelle was not going to fund the purchase. Donna replied to Jeff, "I think I am going to have a panic attack."

9

Later the same day—August 7—Annelle sent Jeff another text, stating he should "take house back and sell it, we will get more money . . . ." She told Jeff to "[h]ave fun evicting them cuz [*sic*] I'm not funding it" and "I really don't give a shit about it" because "[t]he timing doesn't work for me."

Jeff forwarded Annelle's text message to Donna, stating that if she could not get a loan commitment in writing from Annelle, "start making arrangements" to leave the property. Jeff stated he planned "to take possession of the property at the end of the month."

At about 8 p.m. on August 7, Annelle sent a text message to Donna. The beginning states, "I'm going to fund it, Donna." But later in the same text, Annelle lamented, "[i]t's a huge cash flow issue. I won't hang you guys out to dry but I committed to several more houses through the new business and the timing is not good for me."

At about the same time, Jeff sent a text to Donna, asking if she had resolved the funding issue with Annelle. Donna replied, "Albert is on his way home and I have not told him yet cause I did not want him to get upset and have [a] heart attack . . . ."

On August 10 Annelle sent an e-mail to Jeff, offering to buy the Vixen Trail property from him at the $350,000 contract price. She told Donna and Albert she would then rent the property to them for a year to give them time to obtain financing. Annelle added, "This is the best and only thing I can offer to create a solution for everyone and I am doing it reluctantly at best."

10

However, Jeff refused to sell the Vixen Trail property at such a good price to his ex-wife. In a text to Donna, he wrote, "either *we close escrow this month* (or sooner) or I am taking the property." (Italics added.)

D. *Albert Seeks Wells Fargo Bank Financing; Jeff Cancels Escrow*

On August 10, immediately after learning that Annelle reneged on the financing, Albert began seeking bank financing. Albert applied for a loan from Wells Fargo Bank.

On August 18 Albert sent an e-mail to Jeff stating, "I am buying the house and am working with 2 lendors [*sic*], both of them think it will be no problem getting funded. I just have to put larger down payment and give them some paperwork."

Later the same day, Jeff replied, "I am listing the house on the [MLS (multiple listing service)]. If you can get funding [ASAP], that's fine." Jeff ended his e-mail by stating, "I have done nothing but keep my word . . . ."

At about 4 p.m. on August 20, Wells Fargo gave Albert a document stating, "Congratulations! You have become a PriorityBuyer®." The document states, "We're happy to inform you that based on the information you provided, you have been preapproved for a maximum loan amount as shown below." The maximum amount shown was $280,000. Albert already had the $70,000 cash needed to make up the balance of the $350,000 purchase price.

The Wells Fargo preapproval was not a commitment to loan and contained numerous conditions (such as a satisfactory appraisal and title report, and confirmation of income) that were required to be met before Wells Fargo would fund. However, Albert

11

testified, "I could satisfy them easy" [*sic*] and a Wells Fargo loan analyst testified that if all conditions were met, "we would be willing to extend $280,000."

Early the next morning—August 21—Albert telephoned Jeff and left a voicemail message, stating, "I got an approved loan and everything looked excellent . . . ."

At about the same time, Jeff sent an e-mail to escrow asking for "the dates with the escrow package" so he could "understand what options I have—is there a termination date on the docs on non performance" because "Albert and Donna are having issues with financing."

Jeff's e-mail to escrow did not mention that (1) on August 9, he had sent an e-mail to Albert and Donna giving them until the end of August to close escrow ["either we close escrow this month (or sooner) or I am taking the property"]; (2) on August 18, he told Albert, "If you can get funding [ASAP], that's fine"; and (3) prior to August 21, he had sent a text message to Donna giving her until the end of August to close escrow.

At 8:03 a.m. on August 21, escrow responded to Jeff's e-mail, stating escrow had "receive[d] loan approval yesterday.  Please advise if you want to extend or how you would like to proceed."

At 9:26 a.m. on August 21, Jeff e-mailed escrow, stating, "[w]e are out of contract" and instructing, "cancel the escrow documents you have."

At 9:34 a.m. on August 21, Donna sent Jeff a text message, stating, "We have financing through Wells Fargo and are ready to proceed."

At 11:22 a.m. on August 21, unaware that Jeff had cancelled escrow, Albert sent an e-mail to Jeff, stating, "[I] allready [*sic*] got the approval for the loan through [W]ells

12

[F]argo, and the process should be done within 20 days in escrow, you dont have to worry anymore."  At about noon the same day, Donna sent an e-mail to Annelle stating, "We are approved, woohoo . . . .  Is there anyway [*sic*] you can sign the escrow papers and get them to escrow today, I can pick up if need be."

After learning that Albert and Donna had obtained bank financing, Annelle sent an e-mail to Donna and Jeff, stating, "Congratulations Donna!  I am glad you found funding with Wells Fargo and I am happy to sign all the escrow paperwork today . . . ."

At 3 p.m. Donna e-mailed Jeff, stating, "Annelle, Albert and I have all responded to the escrow company to proceed, please respond so we can get this done as soon as possible.  Annelle is signing escrow paperwork now and I will be picking up the completed documents today and taking them to the escrow office . . . .  Please Jeff, I know it has been a long road but lets [*sic*] complete the journey."

Later, near midnight, Albert sent another e-mail to Jeff, stating, "I am so sorry for all the confusion and headache this has caused all of us.  [¶] I am confident that this will have a positive ending as we have been approved for the loan per the agreement. . . .  [¶] Therefore, we ask you to proceed as soon as possible."

At about 12:45 a.m. on August 22, Jeff replied to Albert and Donna stating, "I have 2 cash offers for Vixen [T]rail coming today over $450K.  We have 12 people that want to see it.  This is a problem."  At about 11 a.m. the same day, Jeff sent an e-mail to escrow stating, "I'm not approving the extension until I get more information.  Please cancel."

13

At about 6 p.m. on August 22, Jeff sent another e-mail to Albert and Donna. He wrote, "I have multiple people that want to see the home. We agreed on the selling price back in [A]pril. I agreed in May/June again and you guys 'haggled' with me for about a month on paying rent while you lived there—not good. The escrow papers were signed. You could not get money from your friend [Annelle]—that took 5 weeks. You want me to wait another 4 weeks to sell the house. Not fair. [¶] Market conditions change. I want to get an assessment of what the market will pay. As far as I can see now with the home on MLS for ONE DAY the home can sell for $475K. I have two offers and 22 people that want to see it. [¶] So you guys are asking me to give you $125K divided by 2 (she gets half)."

On August 24 Jeff sent an e-mail to escrow, asking for "confirmation of cancellation of escrow" for the Vixen Trail property.

Although Jeff cancelled escrow, Albert continued seeking financing for a short period. On August 27 Wells Fargo issued Albert a "Commitment Letter" stating, "Congratulations! Your loan application has been approved subject to the terms and conditions including in this commitment letter." Albert testified he could have easily satisfied all conditions. At trial, a Wells Fargo loan analyst testified that all the closing conditions "appear to be feasible" for Albert to have satisfied and "there wasn't anything here that appeared to be out of reach." The bank had "proof that they [Albert and Donna] had the money in the bank that would allow closing."

14

Ultimately, however, Albert stopped seeking to satisfy all of the conditions set forth in the loan commitment because Jeff cancelled escrow and Wells Fargo would not continue processing the loan without a pending escrow.

E. *Procedural History*

In November 2012 Albert and Donna commenced an action against Jeff and Annelle for alleged breach of contract and other related causes of action. At the time of trial, the operative complaint was the second amended complaint, which alleged causes of action for breach of contract, specific performance, fraud, breach of the covenant of good faith and fair dealing, declaratory relief, and injunctive relief.[4]

Annelle settled before trial for $25,000. After Donna and Albert dismissed certain causes of action, and the court granted a motion for nonsuit on fraud, the case was submitted to the jury on two causes of action: breach of contract and breach of the implied covenant of good faith and fair dealing.

The jury returned a verdict in favor of Albert and Donna on both causes of action for $62,500 in damages each. Subsequently, the court entered judgment for $125,000, then deducted $25,000 as and for the amount of Annelle's pretrial settlement, for a total judgment of $100,000, not including costs and attorney fees.

---

4      Before trial, while Donna and Albert were still in possession of the property, Jeff prevailed in an unlawful detainer action against them. The trial court held the unlawful detainer judgment established a landlord-tenant relationship between the parties only for the period July 1, 2012 to the date of that judgment in 2013. That was after the time period Jeff insisted Donna and Albert owed $10,000 rent. As the trial court correctly noted, "that's not really the relevant time period as to the status of the  . . . plaintiffs" in this case.

15

Jeff filed a motion for judgment notwithstanding the verdict (JNOV) on the grounds the judgment was not supported by substantial evidence. In his reply, Jeff also argued that Donna and Albert had failed to plead excuse for nonperformance, and therefore could not recover on this basis. Jeff also argued the special verdict was fatally inconsistent because the jury found both "full performance and excuse for performance."

On November 19, 2014, the court entered judgment, and on January 13, 2015 the court denied Jeff's motion for JNOV. Jeff timely appealed from the judgment and the order denying his JNOV motion.[5]

B. *Jeff's Contention*

In response to question 5, the jury found that Donna and Albert did "all, or substantially all, of the significant things that the contract required them to do in order to close escrow." However, in question 6, the jury found Donna and Albert were "excused from having to do all, or substantially all, of the significant things that the contract required them to do."

Stating, "it is inconsistent to find both performance and excused non-performance of a party's obligations under a contract" (underscoring omitted), Jeff contends the judgment must be reversed because these two findings are irreconcilably inconsistent.

---

[5]      After judgment the court awarded Donna and Albert contractually based attorney fees. Other than contesting the correctness of the judgment itself, Jeff raises no issue on appeal about the attorney fees award.

16

C. *The Standard of Review*

"[W]e review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*).) A party is not required to request clarification of the verdict before the jury is discharged or otherwise object to an inconsistent verdict in the trial court to preserve the issue for appellate review. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530 (*Behr*); *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1093, fn. 6 (*Zagami*).)

D. *The Special Verdict Is Not Irreconcilably Inconsistent*

Where the jury makes "inconsistent determinations of fact based on the same evidence," courts will deem the verdict inconsistent, requiring reversal. (*Cavallaro v. Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 101.) For example, a verdict in an employment case was inconsistent where the jury found the defendant employer had "made no promise" of employment and "had not misrepresented the kind, character, or existence of work," while also finding the defendant had intentionally or recklessly misrepresented and concealed important facts. (*Singh, supra,* 186 Cal.App.4th at p. 359.) In another case, a special verdict was inconsistent because the jury awarded different amounts for the same item of damages. (*Zagami, supra,* 160 Cal.App.4th at p. 1093.) In *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682, the jury valued land in an eminent domain action at $445,000 per acre for purposes of determining the fair market value of the land taken, but valued it at $850,000 per acre for purposes of severance damages. This court held it was inconsistent for the

17

jury to give different value to "the same property at the same point in time . . . ." (*Id*. at p. 683.)

A special verdict is inconsistent—and a new trial is warranted—only if there is no possibility of reconciling its findings. A special verdict is deemed inconsistent only when it is "'beyond possibility of reconciliation under any possible application of the evidence and instructions.'" (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716.) To be inconsistent, there must be "no possibility of reconciling" the findings with each other. (*Singh, supra,* 186 Cal.App.4th at p. 357.) When the court can interpret special verdict responses as being consistent, it must, and in doing so, the court considers not just the special verdict, but also the evidence and jury instructions. (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456-457.) Even if, on its face, the special verdict appears inconsistent, "if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.)

Here, the jury's responses to special verdict questions 5 and 6 are not inconsistent because they do not make different findings based on the same evidence. The Agreement required Donna and Albert to perform three substantial things: (1) sign the Agreement; (2) sign the escrow instructions; and (3) pay the $350,000 purchase price by close of escrow.

There was substantial evidence that Albert and Donna signed (1) the Agreement and (2) the escrow instructions. This evidence supports the jury's finding in question 5

18

that plaintiffs did "substantially all of the significant things that the contract required them to do in order to close escrow by the new deadline."

It is true, of course, that Donna and Albert did not pay the $350,000. But the jury could reasonably find they were excused from doing so because Jeff repudiated the contract by cancelling escrow before the date set for performance; i.e., the end of August 2012.

Jeff does not challenge the jury's finding that he waived the "time is of the essence" provision in the Agreement. Moreover, Jeff's e-mails and text messages establish he agreed to extend escrow to the end of August 2012; i.e., the "new deadline" the jury found to have been reasonable. Substantial evidence establishes Jeff cancelled escrow on August 21—before the extended date of August 31, constituting an anticipatory breach.

Where, as here, the breach is anticipatory; i.e., the breach occurs before the breaching party's performance was due, the anticipatory breach excuses conditions precedent. "A promisor's anticipatory repudiation permits the promisee to recover damages immediately for total breach of contract without performing or offering to perform any conditions precedent under the contract." (*County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1276.) "[A]n anticipatory breach or repudiation of a contract by one party permits the other party to sue for damages without performing or offering to perform its own obligations . . . ." (*Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 625 (*Ersa Grae*).) To recover damages in such a case,

19

the promisee (here, Albert and Donna) must still prove an *ability* or capacity to perform their contract obligations—but that is a separate *damages* issue. (*Ibid.*)

Consistently with this law, the court instructed the jury on anticipatory breach as follows:

> "A party can breach, or break, a contract before performance is required by clearly and positively indicating, by words or conduct, that he or she will not or cannot meet the requirements of the contract.
>
> "If the plaintiffs prove that they would have been able to fulfill the terms of the contract and that Mr. Wiederkehr [Jeff] clearly and positively indicated, by words or conduct, that Mr. Wiederkehr would or could not meet the contract requirements, then Mr. Wiederkehr breached the contract."

Thus, reading special verdict questions 5 and 6 in light of the evidence and instructions—as we must—there is no inconsistency. The jury's finding in question 5 that Albert and Donna did "substantially all" of the significant things the contract required them to do is supported by evidence they timely and properly executed the Agreement and escrow instructions. The finding in question 6 that plaintiffs were "excused from having to do . . . substantially all" of the significant things the contract required them to do is supported by evidence that Jeff anticipatorily repudiated the Agreement by cancelling escrow before August 31, thereby excusing plaintiffs' obligation to pay.

In asserting the findings are irreconcilably inconsistent, Jeff contends, "The jury found that plaintiffs had fully performed all of their obligations [while] . . . [a]t the same time, the jury found that plaintiffs' performance was not excused . . . . It is inconsistent to

20

find both performance and excused non-performance of a party's obligations under a contract." (Underscoring omitted.) However, this argument is incorrect because it misstates the relevant special verdict findings. Contrary to Jeff's assertion, the jury was not asked to, and did not find, that plaintiffs performed "all of their obligations." Question five asks whether plaintiffs performed "all, *or substantially all*" of their obligations. (Italics added.) Similarly, question 6 asks whether plaintiffs were excused from having to do "all, *or substantially all*, of the significant things the contract required. (Italics added.) In this case, the evidence is reasonably susceptible to an interpretation that Albert and Donna did substantially all that they were required to do by executing the appropriate documents, and were also excused from doing their additional substantial obligation of paying the purchase price.

To be fatally inconsistent, there must be "no possibility of reconciling" the findings with each other. (*Singh, supra,* 186 Cal.App.4th at p. 357.) Because in light of the evidence and instructions it is possible to reconcile special verdict findings 5 and 6, the verdict is not inconsistent.

II. *THE JUDGMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE*

Jeff contends the judgment is not supported by substantial evidence in four respects. First, he contends that because Albert and Donna never paid the $350,000 purchase price, there is no substantial evidence to support the special verdict finding number 5 "that the plaintiffs performed all of their obligations to close escrow by the new deadline." Second, Jeff contends there is no substantial "admissible evidence" that plaintiffs were able to pay for the property because the only such evidence was hearsay

21

testimony that a Wells Fargo employee told Albert, "[W]ith your credit and your financing, you have no problem getting [the] loan. You're ready to go." Third, Jeff contends no substantial evidence supports damages because there was no admissible evidence of the home's market price at the time of breach. Fourth, he contends there is no substantial evidence to support the finding he breached the implied covenant of good faith and fair dealing. As explained, none of these contentions has merit.

A. *Special Verdict Question 5*

We reject Jeff's first argument—that there is no substantial evidence to support a finding that Albert and Donna performed "all" of their obligations—because the jury was not asked to, and did not make, the finding Jeff challenges. Contrary to Jeff's argument, special verdict question 5 does not ask the jury whether plaintiffs performed "all" of their contractual obligations. Rather, it asks whether plaintiffs performed "all, *or substantially all*, of the significant things that the contract required them to do in order to close escrow by the new deadline." (Italics added.) As noted *ante,* there is substantial evidence that Albert and Donna executed and delivered the Agreement and escrow instructions. If Jeff wanted the jury to answer a question with more specificity, such as whether plaintiffs performed *all* of their contractual obligations, it was incumbent upon him to request such a finding. (*Behr, supra,* 193 Cal.App.4th at p. 530.)

B. *Substantial Evidence of Ability to Obtain Financing*

"Although it is true that an anticipatory breach or repudiation of a contract by one party permits the other party to sue for damages without performing or offering to perform its own obligations [citation], this does not mean damages can be recovered

22

without evidence that, but for the defendant's breach, the plaintiff would have had the ability to perform." (*Ersa Grae*, *supra*, 1 Cal.App.4th at p. 625.) The requirement that plaintiff prove his or her ability to perform does not mean the plaintiff must show performance was complete by the time of the repudiation. Instead, the plaintiff must show he or she would have been able to perform when his performance came due. (*Henry v. Sharma* (1984) 154 Cal.App.3d 665, 669 (*Henry*).)

Jeff contends there was "no admissible substantial evidence presented at trial to support the inference that plaintiffs had the ability to pay the purchase price." Jeff states Albert obtained only a preapproval from Wells Fargo with numerous unsatisfied conditions precedent to any loan commitment. Jeff asserts the *only* evidence that Albert had the ability to satisfy Wells Fargo's conditions was "inadmissible hearsay testimony" of a bank representative who, according to Albert, told him, "Mr. Ghazal, with your credit and your financing, you have no problem getting [the] loan. You're ready to go" and "You can get—your loan is really easy to get." The court overruled Jeff's attorney's hearsay objection to this testimony, a ruling he contends was an abuse of discretion.

Assuming, without deciding, that the court abused its discretion in overruling Jeff's hearsay objection to this testimony, there is other substantial evidence Jeff does not challenge that amply supports the jury's finding that plaintiffs were harmed (the answer to special verdict question 9) because they had the ability to obtain the loan from Wells Fargo before August 31. Thus, any error in allowing the hearsay testimony is harmless.

"A verdict or finding cannot be set aside on the basis of erroneous admission of evidence if the error did not result in a miscarriage of justice. [Citations.] Such error is

23

not prejudicial if the evidence 'was merely cumulative or corroborative of other evidence properly in the record,' or if the evidence 'was not necessary, the judgment being supported by other evidence.'" (*Rue-Ell Enterprises, Inc. v. City of Berkeley* (1983) 147 Cal.App.3d 81, 91.) A review of the record reveals that the disputed evidence was merely cumulative and corroborative, and the judgment is amply supported by other evidence.

To prove ability to perform, it was *not* necessary for Albert and Donna to show Wells Fargo was legally bound to advance the money needed to complete the purchase. In *Henry, supra,* 154 Cal.App.3d 665, the court rejected the argument that without proof of an existing legally enforceable loan contract, a buyer cannot prove he or she is ready, willing, and able to perform under a real estate purchase agreement. Proof of ability to perform may be made by showing the buyer "'commanded resources upon which he could obtain the requisite credit.'" (*Id.* at p. 671.) In other words, the "proof needed to show ability [to perform] depends [not on the existence of a legally enforceable loan agreement, but] on all the surrounding circumstances." (*Id.* at p. 672.)

*Henry* is similar to the circumstances here. The buyers in *Henry* had entered into a contract to purchase property and had received tentative loan approval. (*Henry*, *supra*, 154 Cal.App.3d at pp. 670-671.) The seller cancelled escrow. Noting evidence that the buyers had the financial resources to qualify for the loan, the court in *Henry* held there was substantial evidence of the buyer's ability to obtain the necessary credit to complete the purchase. (*Id.* at pp. 671-672.) Further, the court held the seller's anticipatory breach excused the buyer's required performance of obtaining final loan approval. The court

24

explained, "[W]e see no purpose in requiring the buyers to bind themselves to a loan for which they have no immediate need.  Moreover, we question whether a lender would make a firm commitment to loan money for the purchase of property the present owner refuses to sell."  (*Id.* at p. 672.)

Similarly, in *Behniwal v. Mix* (2005) 133 Cal.App.4th 1027, 1045 (*Behniwal*), the court relied upon *Henry* in holding purchasers presented sufficient evidence that they were able to purchase property by showing they were preapproved for a loan and had arranged with a relative to help with the deposit.

These two cases recognize that the requirement a buyer be able to perform is ultimately a highly factual inquiry that "depends on all the surrounding circumstances." (*Henry, supra,* 154 Cal.App.3d at p. 672; *Behniwal*, *supra,* 133 Cal.App.4th at pp. 1044-1045.)

Here, entirely apart from the hearsay evidence Jeff challenges, there is substantial evidence Albert had the ability to obtain the requisite loan by the end of August 2012. On August 20 Wells Fargo preapproved Albert for a $280,000 loan.  Albert testified he already had the $70,000 cash needed to make the balance of the $350,000 purchase price. Albert testified that he could have satisfied all conditions in the preapproval "eas[ily]." The testimony of a single witness, even the party himself, may constitute substantial evidence.  (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)  Moreover, a Wells Fargo loan analyst, Sarah Thayer, testified that Albert's preapproval by Wells Fargo meant that "a loan would be feasible" and "based on the initial information that was submitted, we would be—if all other conditions would be met, we would be willing to extend

25

[$]280,000." She added that if Albert were able to meet the conditions, "he would have no reason to think that he wouldn't be able to proceed with the financing process." Thayer also testified that "there wasn't anything here [in the conditions] that appeared out of reach" and Wells Fargo had "proof that they [Albert and Donna] had the money in the bank that would allow closing." To the extent conditions remained unsatisfied, Thayer explained it was not that the requested documents did not exist, but simply "we didn't have complete copies or signed copies or needed explanations of what we already had."

In sum, there is substantial evidence of no financial impediment to Albert obtaining the requisite financing, and the evidence shows that but for Jeff's breach, Albert had the ability to fund the purchase price by the end of August 2012. Under *Henry* and *Behniwal*, this was sufficient to show ability to perform.

C. *Substantial Evidence of Market Price at the Time of Breach*

Albert and Donna did not present any expert real estate appraiser to testify to an opinion of the market value of the Vixen Trail home. Instead, they sought to establish damages, measured by the contract-price/market-price differential, based on Jeff's admissions of market price. For example, trial exhibit 48, an e-mail Jeff wrote to Albert on August 22, states:

> "[W]ith the home on the MLS for ONE DAY the home can sell for $475[K]. I have two offers and 22 people that want to see it. [¶] So you guys are asking me to give you $125K . . . ."

Similarly, trial exhibit 42, an e-mail Jeff sent to Donna and Albert on August 22, states, "I have 2 cash offers for Vixen [T]rail coming today over $450K."

26

The jury apparently relied on this evidence, awarding $62,500 in damages for breach of contract and $62,500 for breach of the implied covenant of good faith and fair dealing, for a total award of $125,000.

Evidence Code[6] section 813, subdivision (a)(2) provides that an owner of property may render an opinion on value.[7] Sections 815 to 821 list the type of evidence that may be relied upon in forming an opinion of value.[8]

Section 822, subdivision (a) provides that a mere unaccepted offer to purchase is generally inadmissible on the issue of value. This statute provides in relevant part: "(a) In an eminent domain or inverse condemnation proceeding, . . . the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of property: [¶] . . . [¶] (2) The price at which an offer or option to purchase . . . was made . . . except that an option, offer, or listing may be introduced by a party as an admission of another party to the proceeding; but nothing in this subdivision permits an admission to be used as direct evidence upon any matter that may be shown only by opinion evidence under Section 813."

---

6       All statutory references are to the Evidence Code unless otherwise specified.

7       Section 813, subdivision (a) provides in part: "(a) The value of property may be shown only by the opinions of any of the following: [¶] (1) Witnesses qualified to express such opinions. [¶] (2) The owner or the spouse of the owner of the property or property interest being valued."

8       The type of evidence that may be relied upon includes: sales of the subject property (§ 815), comparable sales (§ 816), leases (§ 817), comparable leases (§ 818), capitalization of income (§ 819), reproduction cost (§ 820), and conditions in the general vicinity of the property (§ 821).

Subdivision (b) of section 822 makes this rule applicable to noneminent domain proceedings, by providing in part, "(b) In an action other than an eminent domain or inverse condemnation proceeding, the matters listed in subdivision (a) [of section 822] are not admissible as evidence . . . except to the extent permitted under the rules of law otherwise applicable."

Thus, an offer to purchase is inadmissible evidence on the value of real property, except as a party-admission, and in that situation, admissibility is limited to impeachment, and not as direct evidence of value.

Citing these rules, coupled with the absence of any expert testimony on market value at the time of breach, Jeff contends no substantial evidence supports the damage award. Jeff adds that at trial, he testified the offers referred to in his e-mails were not actually offers, and he expressed no opinion of the property's value.

Despite section 822, Jeff's argument is untenable because his attorney *stipulated* to the admissibility of these e-mails. Jeff's attorney concedes this fact in his brief, acknowledging that "[d]efense counsel stipulated to admission of the emails sent by Jeff," including exhibits 42 and 48, which are quoted *ante*. Counsel does not cite anything in the record showing an objection was made to these exhibits under section 822, or on any other ground. Accordingly, Jeff is precluded from complaining on appeal about the admissibility of this evidence. (See *People v. Robertson* (1982) 129 Cal.App.3d 546, 548 ["[t]here is no question but that otherwise inadmissible evidence may become admissible when the parties stipulate thereto"]; *Leonard v. City of Los Angeles* (1973) 31 Cal.App.3d

28

473, 476 ["A binding stipulation admitting evidence may be made, even if such evidence is otherwise inadmissible."].)

Moreover, the jury was entitled to, and did, disbelieve Jeff's attempt to soft-peddle his statements as mere puffing. Jeff was experienced in buying and selling residential real estate. He unequivocally told Albert and Donna "the home can sell for $475[K]" and he had two such "offers" in hand. The jury was entitled to determine he meant what he said.

D. *Substantial Evidence of Breach of the Implied Covenant of Good Faith*

The jury found that Jeff "unfairly interfere[d] with the plaintiffs' right to receive the benefits of the contract." Jeff contends there is no substantial evidence supporting this determination because Jeff frequently encouraged plaintiffs to close escrow promptly, sent e-mails about the rising value of the property merely to "encourage them to close," and plaintiffs "presented no substantial evidence that they were in a position to tender the purchase price" at any time; rather, Albert asked Jeff for a $30,000 loan to be able to obtain the Wells Fargo loan.

Jeff's argument is unavailing because it ignores the applicable standard of review, which requires evidentiary conflicts and conflicting inferences to be resolved in favor of Donna and Albert as prevailing parties. "We do not reweigh the evidence or reconsider credibility determinations." (*Katsura v. City of Buenaventura* (2007) 155 Cal.App.4th 104, 107.)

The jury reasonably could have concluded Jeff breached the implied covenant of good faith and fair dealing by holding his signed escrow papers hostage unless and until

29

Donna and Albert paid his $10,000 demand for "rent" that was not provided for in either the purchase Agreement or escrow instructions. This delayed escrow from June 3, 2012 (when Jeff first demanded the $10,000) until at least July 16, 2012. And, as such, it undermines Jeff's claim he was encouraging a quick close of escrow.

Moreover, although Jeff correctly states he frequently told Albert and Donna the home was worth substantially more than the $350,000 contract price, the jury was not required to accept Jeff's benevolent interpretation of his intent. Rather, the evidence reasonably explains Jeff's motive—to make more money by selling to someone else at a higher price. Jeff breached the implied covenant by cancelling escrow just as Albert and Donna were on the cusp of obtaining bank financing. Indeed, he cancelled escrow just *three weeks* after finally getting his notarized documents into escrow, and just *days* after submitting the grant deed into escrow.

Jeff's arguments about the $30,000 loan Albert requested is also inconsistent with the standard of review. Contradicting Jeff's testimony, Albert testified he asked Jeff for a $30,000 loan, *not* to finance the home purchase, but rather to fix the leaky roof and swimming pool crack. Viewing the evidence in the light most favorable to the judgment, as we must, substantial evidence supports the jury's finding that Jeff breached the implied covenant of good faith and fair dealing.

### III. *PLAINTIFFS ADEQUATELY PLEADED EXCUSE*

Jeff contends the second amended complaint does not plead Donna and Albert were *excused* from performing (paying the purchase price), but instead alleges plaintiffs obtained funds and were ready to perform. He asserts that in light of the evidence and the

30

plaintiffs' theory at trial, this is a fatal pleading defect requiring the judgment to be reversed.

We disagree.  The second amended complaint alleges facts constituting anticipatory repudiation.  Paragraph 9 alleges, "Despite agreeing to extend the close of escrow to August 31, 2012, on August 21, 2012, Defendants informed escrow that there [*sic*] were cancelling this subject purchase and sale transaction."  By pleading facts constituting anticipatory repudiation, plaintiffs adequately alleged the legal effect of such repudiation, namely, that performance on their part was excused.  (*Daum v. Superior Court* (1964) 228 Cal.App.2d 283, 287-288.)

To support his argument, Jeff cites three old California Supreme Court cases, but all of them are materially distinguishable.  *Peek v. Steinberg* (1912) 163 Cal. 127 involves an action for breach of a contract to sell company stock and to employ the plaintiff as general manager.  It did not involve anticipatory breach. *Kirk v. Culley* (1927) 202 Cal. 501 involved an attorney-client fee agreement, and does not involve an allegation of anticipatory breach.  *Herdal v. Sheedy* (1916) 173 Cal. 163, upon which Jeff also relies, is similarly distinguishable.  There, the contract to construct a building was fully performed, and therefore it too does not involve pleading anticipatory breach.

31

DISPOSITION

The judgment is affirmed.  Albert Ghazal and Donna Scharf shall recover costs on appeal.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.