Filed 6/22/21  Equassure v. de la Cruz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| EQUASSURE, INC., | B300397 |
| Plaintiff and Appellant, v. | (Los Angeles County Super. Ct. No. BC641419) |
| EFREN DE LA CRUZ et al., Individually and as executors, etc., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge.  Affirmed as modified.

Robert E. Stenson; Newhouse Law Group, Michael R. Newhouse and Suzanne M. Henry for Plaintiff and Appellant.

John L. Dodd & Associates, John L. Dodd; Remer, DiVincenzo & Griffith and Joseph P. DiVincenzo for Defendants, Appellants Efren de la Cruz and Leonila de la Cruz, individually and as executors of the Estate of Vladimir Micanovich.

_____

Equassure, Inc. appeals the judgment entered following a court trial in its action against Efren de la Cruz and Leonila de la Cruz, in their individual capacities and as executors of the estate of Vladamir Micanovich, alleging breach of a real estate purchase contract and fraud. Equassure contends the trial court erred in concluding the contractual obligations of Equassure, on the one hand, and the de la Cruzes, on the other hand, were discharged when neither side tendered performance by the deadline set for close of escrow in a contract that specified time was of the essence. Equassure also contends the court misinterpreted the contract in ruling Equassure was entitled to only a partial refund of its earnest money deposit and misconstrued the basis for its fraud claim in concluding it had failed to carry its burden of proof on that cause of action.

The de la Cruzes have also appealed, contending the court erred in concluding Equassure was entitled to a refund of part of its deposit and in calculating the amount of prejudgment interest. In addition, they request we modify the judgment to state explicitly the court's implied finding the de la Cruzes were not individually liable for any of Equassure's claims. We modify the judgment to reflect the proper amount of prejudgment interest and, as modified, affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Parties*

The de la Cruzes, former tenants and friends of Vladimir Micanovich, are the executors of his estate. Leonila de la Cruz is also an estate beneficiary. At the time of Micanovich's death in 2011 at 96 years old, his estate owned, in whole or in part, four

2

contiguous parcels of land in Carson covering one and one-half acres.[1]

Equassure is a corporation owned by Robert E. Stenson, who also serves as Equassure's attorney and managing director.

2. *The Vacant Land Purchase Agreement (VLPA)*

In August 2015 the de la Cruzes, as executors of Micanovich's estate, entered into an agreement to sell all four of the Carson parcels ("the property") to Equassure, which, in turn, intended to develop the property by building a multi-unit apartment complex.[2] Although the property contained occupied structures, including a duplex and a single-family residence, the parties used a printed California Association of Realtors form for vacant land purchase agreements (C.A.R. Form VLPA), inclusive of two addendums, to memorialize their agreement because Stenson was not interested in the structures. He wanted the land.

The VLPA provided for an all cash purchase of the property for $3 million with a one-year escrow. Stenson explained at trial

---

[1] The de la Cruzes are also the cotrustees of Micanovich's trust. Although the complaint alleges the estate owned in whole or in part the parcels in question, the record at times refers to the trust as the property owner. Because this discrepancy is not material to the issues before us, we refer to the estate as the property owner and the de la Cruzes as executors rather than trustees, consistent with Equassure's operative second amended complaint and the parties' appellate briefs.

[2] The de la Cruzes received permission from the probate court to proceed with any transfer of property in accordance with the Independent Administration of Estates Act (Prob. Code, § 10450 et seq.), relieving the estate of the obligation to obtain court approval for the sale to Equassure.

3

he had initially offered a lower price with a shorter escrow, but ultimately agreed to a purchase price of $3 million in exchange for a one-year escrow that would allow Equassure the time it needed to obtain design, engineering and environmental approvals from the city ("entitlements") for land development. Both parties acknowledged in the VLPA and at trial, however, the sale was not dependent on Equassure obtaining its entitlements. The VLPA expressly stated escrow would close on August 18, 2016 "with no extensions, no conditions or contingencies to closing; time is of the essence."

The VLPA required Equassure to transfer into escrow in two installments a total deposit of $150,000 to be applied to the purchase price: The first $75,000 was to be made at the opening of escrow and "released, non-refundable" to the seller (the de la Cruzes as executors) at the end of a 45-day due diligence period after contingencies were satisfied; the second $75,000 was to be deposited within five months of acceptance and released to the seller "at six months from acceptance date" "without any further instructions, documentation or consent from Buyer."

Because Equassure was purchasing the property explicitly for its vacant land value and did not want to contend with delays caused by tenants asserting any right to remain on the property, the estate agreed to "deliver the Property to Buyer [Equassure] free of any occupants at the close of escrow. This shall be one of Buyer's conditions of closing escrow." In addition, the estate promised "all debris and personal property not included in the sale [including four large storage containers on the property] shall be removed by Close of Escrow." According to its terms, the VLPA was a fully integrated agreement, and any changes were

4

invalid and unenforceable unless agreed to by the parties in writing.

Before the parties executed the VLPA, the estate's lawyer Joseph P. DiVincenzo informed Equassure a title search in connection with a prior escrow that had fallen through had revealed a cloud on title on one of the parcels (parcel number 4). In particular, records from the county recorder reflected an individual named Stane Miletich owned a 50 percent undivided interest in parcel 4, which she had transferred to the Stane Miletich trust in 1993. Stane Miletich died in December 1996. DiVincenzo told Equassure he was working on, and would be able to resolve, the title issue within the next year before escrow closed. At Equassure's request, the estate promised in the VLPA "to deliver good, marketable title at or before close of escrow."

### 3. *Post-contracting Activities*

#### a. *Equassure's difficulty obtaining entitlements and its subsequent proposals to amend the escrow*

During the due diligence period Equassure worked on obtaining entitlements. After the City of Carson indicated it would support the project, Equassure waived its due diligence contingencies and directed the earnest money payments be made to the estate in accordance with the VLPA terms.

By July 2016, however, it had become clear to Stenson that Equassure would not be able to complete its entitlements by the August 18, 2016 closing date or even shortly thereafter. On July 11, 2016 Stenson proposed to the de la Cruzes in writing to keep the August 2016 closing date but change the payment structure: Equassure would pay $450,000 and the de la Cruzes

would take back a note for the remaining $2.4 million.[3]  The de la Cruzes, through the estate's real estate agent Jerry Carew, rejected the proposal, telling Stenson they wanted the full purchase price at the close of escrow and to move on "without being the bank."

On July 29, 2016 Stenson wrote to Carew with a different proposal:  Extend the closing to December 31, 2016 with an offer of four months of rent-free tenancy (the de la Cruzes lived on the property) and a payment plan for the balance of the purchase price.  After talking with the de la Cruzes, Carew responded on August 4, 2016 that the de la Cruzes were ready to close and did not wish to extend the closing date.  Stenson continued to press for a formal amendment to the escrow.  On August 19, 2016, the day after escrow was scheduled to close, Stenson wrote to the estate proposing that Equassure would "pay an additional $50,000 nonrefundable deposit to be released to the sellers" in exchange for the extension of escrow to the end of the year; if entitlements were not approved by the end of the year, Equassure "could exercise an option to extend the escrow for an additional four months for an additional non-refundable deposit of $55,000 which would be released from escrow immediately upon exercising the extension option.  If escrow is not closed by the end of the extension option, it would automatically be cancelled."  The estate did not accept the proposal.

        b. *The estate's failed efforts to obtain marketable title by the date scheduled for close of escrow*

---

[3]    Stenson explained his proposal would have allowed Equassure more time to complete its entitlements without having to fund the $2.85 million balance by August 18, 2016, while still enabling the de la Cruzes to close escrow on schedule.

6

The de la Cruzes were unsophisticated sellers, relying entirely on DiVincenzo and Carew to handle the sale. DiVincenzo testified as to his efforts on behalf of the estate to obtain marketable title on parcel number 4: Initially he believed an unrecorded 1978 grant deed from Stane Miletich to Micanovich that he had discovered about the time the previous escrow fell through could be recorded and satisfy the cloud on title issue. But, citing problems with that chain of title (the record showed the Miletich trust owned the property, not Stane Miletich), the county recorder would not record the 1978 deed. DiVincenzo then found among Micanovich's papers Stane Miletich's 1993 trust, which designated Micanovich as the sole beneficiary of all right, title and interest Stane Miletich owned in parcel 4. DiVincenzo believed that, combined with the recorded 1993 deed from Stane Miletich to her trust, the two legal documents would establish Micanovich's sole ownership of parcel 4 following Stane Miletich's death. However, because the trust documents were unsigned, it was not clear that a valid trust existed; and DiVincenzo needed a court order that would recognize the trust and confirm the chain of title. In June 2016 DiVincenzo filed a petition with the probate court on the estate's behalf to establish Micanovich's title to parcel 4, but the hearing on the petition was scheduled for October 2016, after the escrow was scheduled to close.

DiVinecenzo testified that, to remove the cloud on the Micanovich estate's title before escrow was scheduled to close, he had obtained an oral agreement from the Miletich heirs to transfer all their interests in parcel 4 to the Micanovich estate for $250,000, which the de la Cruzes would obtain from Equassure's purchase price payment at the close of escrow. Because the

7

assignment of $250,000 of its funds to the Miletich heirs was not part of the existing escrow instructions, DiVincenzo testified he had prepared agreements and the necessary deeds that, if signed, would have allowed the transfer of title from the Miletiches to the Micanovich trust and then to Equassure, all of which would have occurred simultaneously at the close of escrow. He also testified he planned to obtain ex parte relief from the probate court to obtain the court order and establish the chain of title necessary for escrow to close. DiVincenzo acknowledged the documents were never signed and his plan never materialized. According to DiVinenzo, the plan to obtain the Militeches' interests fell through when Equassure made clear it lacked the funds to be able to pay the balance owed and close escrow by August 18, 2016. In fact, DiVincenzo testified, Stenson had told him in a conversation in the middle of August 2016 that it could be up to nine months before Equassure could obtain the entitlements.

On August 15, 2016, three days before the date set for close of escrow, the Miletich relatives filed a quiet title complaint in superior court asserting their legal interest in parcel 4. Equassure was unaware of the quiet title lawsuit at that time.

      c.   *The de la Cruzes' demand to close escrow and Equassure's reply*

The escrow closing date of August 18, 2016 came and went without Equassure depositing any additional funds into the escrow and without the de la Cruzes depositing the deeds to any properties. On August 22, 2016 the estate, acting through DiVincenzo, served Equassure with a demand to close escrow

8

(DCE) by August 25, 2016 pursuant to paragraph 19F of the VLPA.[4]

Equassure responded the next day in a letter to the escrow officer, with copies to DiVincenzo and the de la Cruzes, asserting the demand was improper and void because the estate had not fully performed or tendered performance:  It had not produced current leases and rental agreements demonstrating that the tenants other than the de la Cruzes had no legal right to occupy the premises; the estate had not removed the four large storage containers from the property; and it had not obtained from the city a residential property report or a city waiver of that requirement as then required under Carson Municipal Code former section 5902, which the escrow agent testified at trial would have been necessary for escrow to close.  The letter did not mention the estate's failure to obtain marketable title because, as Stenson testified at trial, he was not aware it remained an issue:  Neither the de la Cruzes nor their representatives had mentioned any difficulty resolving the cloud on title.  As to Equassure's obligation to pay the balance of the purchase price, Equassure advised the estate, "Buyer can begin to make arrangements for deposit of the necessary closing funds into escrow, if and when Seller has fully performed all of its obligations and has satisfied

---

[4]    Paragraph 19F of the VLPA provides, "**Close of Escrow:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a demand to close escrow (C.A.R. Form DCE).  The DCE shall:  (i) be signed by the applicable Buyer or Seller, and (ii) give the other Party at least 3 Days After Delivery to close escrow.  A DCE may not be Delivered any earlier than 3 Days Prior to the scheduled close of escrow."

Buyer's conditions of closing." Stenson testified the letter was not intended to put the estate in default; Equassure still wanted to close the deal.

On September 27, 2016, after receiving no response to its efforts to reach out and "have a dialogue" with the de la Cruzes, Equassure filed a notice to seller to perform, enumerating the same conditions as it had in its reply to the demand to close escrow. Equassure still had not deposited the balance owed.

On September 29, 2016 DiVincenzo responded, asserting the escrow was cancelled because Equassure had failed to perform: "It has now been 43 days from the original closing date, and the Buyer has still failed to deposit, or to legally tender, the balance of the purchase price in order to close escrow. The buyer has defaulted and the [VPLA] and the escrow are subject to immediate cancellation." DiVincenzo offered a "one time agreement" to extend the escrow for an additional $200,000 nonrefundable deposit, to be added to the purchase price. Equassure promptly denied the offer.

4. *Equassure's Lawsuit*

In November 2016, after the property had been placed back on the market, Equassure filed this lawsuit, suing the de la Cruzes in their individual capacities and as executors, for breach of contract, violation of the unfair competition statute (Bus. & Prof. Code, § 17200) and fraud. The complaint sought alternative remedies of benefit-of-the-bargain damages, specific performance and rescission.[5] It also recorded a notice of

---

[5] Equassure's operative second amended complaint also included a claim for declaratory relief concerning parcel 4, which Equassure acknowledges in its appellate brief was mooted before trial by an intervening ruling from the probate court.

pendency of action (lis pendens). The parties agreed to a bench trial.

5. *The Parties' Positions at Trial*

Equassure argued at trial that it had been ready, willing and able to close escrow on August 18, 2016 even without receiving its entitlements. Although Stenson conceded Equassure did not have the money in its account to close escrow, Equassure "had access" to the $2.85 million balance it owed through Stenson's brother, who had financed Equassure's other acquisitions. Stenson provided his brother's bank account statements to demonstrate his brother had sufficient funds in his investment accounts as of August 18, 2016 to pay the balance owed. Stenson's brother did not testify.

Stenson acknowledged no formal agreement or promissory note had been prepared for his brother to transfer the funds and he had not spoken to his brother about depositing the funds to make sure escrow closed in August 2016 as scheduled. Asked at trial as to why, if he had access, he did not deposit the money, Stenson explained he did not want to tie up nearly $3 million in escrow (and reduce his brother's return on investment as entitlements still needed to be obtained before the property could be sold) without evidence that the de la Cruzes had fulfilled their own "conditions precedent," including removal of tenants and the storage containers and obtaining marketable title. Nevertheless, Stenson insisted, Equassure was ready, willing and able to perform and could have paid the balance of the purchase price, had the de la Cruzes not repudiated the contract on September 29, 2016.

The de la Cruzes argued the estate could have satisfied all the "concurrent conditions" it had assumed in order to close

11

escrow by August 18, 2016, including obtaining the necessary deeds from the Miletich heirs and the requisite court order to remove the cloud on title.  In addition to DiVincenzo's testimony concerning his oral agreement with the Miletich relatives, the de la Cruzes provided evidence they had made reservations to move to a motel and to move the containers by close of escrow.  (The trial court was dubious the de la Cruzes had made arrangements to move the containers, noting they had testified a crane would be needed and no evidence had been submitted to suggest one was obtained.)  It was Equassure, they argued, that could not, and did not, perform.  Accordingly, Equassure had no right to a return of any of its $150,000 earnest money deposit, which the de la Cruzes contended they were entitled to retain as liquidated damages as specified in the VLPA.

6. *The Trial Court's Statement of Decision*

After an 11-day court trial the court made the following findings in a detailed statement of decision:

(1)  The parties' respective obligations under the VLPA to deliver marketable title and deposit the purchase price, among other things, were mutually dependent, concurrent conditions.  When neither side fulfilled those conditions or tendered performance by the closing date in a contract that specified time is of the essence, the parties' obligations were discharged.  The court found Justice Gilbert's opinion in *Pittman v. Canham* (1992) 2 Cal.App.4th 556 (*Pittman*) to be particularly on point in these circumstances.

(2)  Neither party had committed an anticipatory breach.

(3)  Equassure could not carry its burden to demonstrate specific enforcement because it had not demonstrated it was ready, willing, and able to pay the $2.85 million balance due by

12

the scheduled closing date. The court found Stenson's testimony that he had "access" to funds from his brother, Equassure's sole investor, insufficient to carry its burden, particularly since Stenson had acknowledged he had not obtained any form of agreement from his brother or even discussed the effect of the delay of entitlements on his brother's funding. The fact that Stenson's brother had financed other projects did not mean he would have deposited the purchase price in August 2016 with an unanticipated nine-month wait on entitlements.

(4) Relying on the plain language of the VLPA, the court found the first $75,000 deposit was nonrefundable; the second was refundable if escrow did not close.

(5) Describing Equassure's fraud cause of action as premised on allegations the de la Cruzes never intended to sell the property, the court found that Equassure had not proved that claim by a preponderance of the evidence. As to Equassure's allegation the de la Cruzes committed fraud by failing to disclose its ongoing negotiations with the Miletiches, the court stated it "would have no difficulty finding fraud but for one fact": DiVincenzo disclosed the probate and the title issues related to parcel 4 before Equassure signed the VLPA. While DiVincenzo "should have been more forthcoming about his progress (or lack thereof) of negotiations with the Miletich parties, . . . the court does not believe his failure to do so constitutes fraud, especially because many of the facts were available from the public record."

(6) Equassure's cause of action for violation of Business and Professions Code section 17200 also failed because "the defendants' behavior does not fall within the definition of unfair that our courts follow."

The court entered judgment in favor of Equassure in the amount of $101,856.16, $75,000 in compensatory damages plus $26,856.16 in prejudgment interest, which it calculated from December 4, 2015, the date Equassure made its first deposit of $75,000 into escrow.[6]

Both Equassure and the de la Cruzes filed timely notices of appeal.

## DISCUSSION

### *Equassure's Appeal*

1. *Principles of Contract Interpretation*

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (See Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]; 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].) The words are to be understood "in their ordinary and popular sense" (Civ. Code, § 1644); and the

---

[6] The court filed an amended judgment nunc pro tunc to correct a typographical error in the amount of prejudgment interest awarded.

14

"whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

When no ambiguity is asserted or there is no conflicting extrinsic evidence concerning the meaning of a purported ambiguity in the contract, the trial court's interpretation of a contract is a legal determination subject to de novo review. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393-394; *Khan v. Shim* (2016) 7 Cal.App.5th 49, 55.)

> 2. *Equassure Failed To Carry Its Burden on Its Breach of Contract Claim*

To prevail on a cause of action for breach of contract, a plaintiff must demonstrate (1) a contract existed; (2) plaintiff performed or its performance was excused; (3) the defendant breached; and (4) resulting damage.[7] (*Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 453; *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 228 (*Rutherford*).)

Equassure contends it carried its burden on each of these elements. Although it concedes it failed to perform by tendering the balance of the purchase price as required under the VLPA, Equassure contends its obligation to do so was excused because it was dependent on the de la Cruzes's performance of several conditions precedent—delivering marketable title, obtaining a residential property report and removal of the tenants and storage containers from the property.

Equassure relies on *Rubin v. Fuchs* (1969) 1 Cal.3d 50 (*Rubin*) to support its argument that these requirements were

---

[7] Equassure has explicitly abandoned on appeal any argument it is entitled to specific performance.

conditions precedent to its own performance. In *Rubin* a buyer agreed to purchase certain real property from the seller for $30,000 in cash to be deposited before the close of escrow and execution of a purchase money deed of trust for the balance. (*Id.* at p. 52, fn. 1.) The sellers (defendants) agreed to subdivide the property and record a tract map before the closing date. The parties declared in the agreement "time was of the essence." Neither party performed its obligations by the dates specified in the agreement for escrow to close. When the sellers cancelled the escrow citing the buyer's failure to perform and later sold the property to a different buyer for a higher price, the buyer sued. The trial court ruled in the sellers' favor, finding the buyer had failed to perform despite several demands by the sellers for the buyer to deposit the deed of trust. The Supreme Court reversed, holding the requirement that the sellers record a subdivision tract map before close of escrow was a condition precedent to buyer's performance—the recording of the map was necessary for the buyer to obtain the property description necessary for the preparation of the deed of trust. (*Id.* at p. 54.) Accordingly, the sellers' failure to perform the condition precedent of recording the subdivision tract map excused the buyer's performance; and the buyer could recover for breach of contract despite failing to deposit the full down payment into escrow. (*Ibid.*)

"The rule is that provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction. [Citations.] Instead, whenever possible the courts will construe promises in a bilateral contract as mutually dependent and concurrent." (*Rubin, supra*, 1 Cal.3d at pp. 53-54; accord, *Rutherford, supra*, 223 Cal.App.4th at p. 228; see *Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172,

1183 ["courts shall not construe a term of the contract so as to establish a condition precedent absent plain and unambiguous contract language to that effect"].)

Unlike the circumstances in *Rubin,* Equassure's payment obligation due at close of escrow was not dependent on any prior occurrence. (See Civ. Code, § 1436 ["[a] condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed"]; *Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 314 [same].) To the contrary, the parties' obligations, including the estate's promise to deliver marketable title, were expressly identified as occurring before or "at close of escrow." (See *Patel v. Liebermensch* (2008) 45 Cal.4th 344, 350 ["'[i]n a contract for the sale of real estate the delivery of the deed and the payment of the purchase price are dependent and concurrent conditions'"].)

Equassure alternatively argues the de la Cruzes repudiated the VLPA on September 29, 2016, excusing Equassure's obligation to deposit the purchase price. (See *Buckmaster v. Bertram* (1921) 186 Cal. 673, 678 ["positive repudiation of a contract of sale by vendor excuses the vendee from a formal tender of the price"]; *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 507 ["where a party *repudiates the contract* before the other's performance is due, he thereby excuses the other party entirely from performing"]; *Kossler v. Palm Springs Developments, Ltd.* (1980) 101 Cal.App.3d 88, 102 [unequivocal repudiation of the contract by one party excuses performance of a concurrently conditional obligation of nonbreaching party].)

Relying on *Pittman, supra,* 2 Cal.App.4th 556, the trial court found the de la Cruzes' September 29, 2016 repudiation of the VLPA occurred too late to make any difference. When

17

neither party had performed by the date required for performance in a contract that established "time is of the essence," and that provision had not been waived, the court ruled, the parties' mutual obligations were discharged. We agree the analysis in *Pittman* controls.

In *Pittman* the buyer and seller entered into a land purchase/sale agreement. The buyer drafted the contract and, pursuant to its terms, transferred an earnest money deposit into escrow. The agreement and escrow instructions specified time is of the essence. Prior to the December 24, 1987 closing date the seller deposited a signed deed into escrow, but neglected to have the deed notarized. After the omission was brought to the buyer's attention, the buyer stated she would have the deed notarized. However, the December 24, 1987 closing date "came and went" without either the seller depositing a notarized deed or the buyer tendering the balance owed or a promissory note and deed of trust. (*Pittman*, *supra*, 2 Cal.App.4th p. 558.) Several months later, the seller entered into a contract with another purchaser. The buyer sued the seller for breach of contract.

On appeal following a judgment for the seller, the buyer acknowledged, in accordance with well-established law, that the deposit of the balance by the buyer and the deposit of the deed by the seller were concurrent conditions. (*Pittman, supra,* 2 Cal.App.4th at p. 559, citing *Rubin, supra,* 1 Cal.3d at pp. 53-54 and *Chan v. Title Ins. & Trust Co.* (1952) 39 Cal.2d 253.) Nonetheless, the buyer argued, the failure of both parties to perform did not automatically terminate the contract. The contract remained viable—the escrow remained open—until one side tendered performance and put the other in default. (*Pittman*, at p. 559.)

The *Pittman* court rejected that analysis: "Contrary to [buyer's] assertion, the failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure. The failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform. Thus, where the parties have made time the essence of the contract, at the expiration of time, without a tender by either party, both parties are discharged. [Citation.] Here, because time was made the essence of the contract, the failure of both parties to tender performance by December 24, 1987, discharged both from performing. Neither party can hold the other in default and no cause of action to enforce the contract arises." (*Pittman, supra,* 2 Cal.App.4th at pp. 559-560.) The *Pittman* court continued, "We appreciate the reluctance of a buyer to act first by placing money into escrow. But in a contract with concurrent conditions, the buyer and seller cannot keep saying to one another, 'No you first.' Ultimately, in such a case, the buyer seeking enforcement comes in second; he loses." (*Id.* at p. 560; accord, *Rutherford, supra*, 223 Cal.App.4th at p. 228 [when both parties "fail to perform the concurrent conditions required for closing," the duties of both parties are discharged].)

Equassure contends the case at bar is more analogous to *Ninety Nine Investments, LTD v. Overseas Courier Service (Singapore) Private, Ltd.* (2003) 113 Cal.App.4th 1118 (*Ninety Nine Investments*), than to *Pittman, supra*, 2 Cal.App.4th 556. In *Ninety Nine Investments* the trial court denied a buyer's request for specific performance of a land purchase agreement, concluding the buyer's failure to satisfy performance conditions

19

by depositing the purchase money into escrow precluded the buyer's recovery for breach of contract. The court of appeal reversed, finding no substantial evidence to support the court's finding. Distinguishing *Pittman,* the *Ninety Nine Investments* court held, "[W]e cannot conclude that the mutual obligations of the parties could be unilaterally extinguished because escrow was not able to close on January 14, 2000. This was not a situation in which the simple exchange of deed for consideration was involved. Rather, the [multiple] escrows here required performance of a number of steps, some necessarily in a particular sequence, to permit the escrows to be in a position for the simultaneous final concurrent exchange of deed for consideration. . . . The evidence established without dispute that appellant [buyer] had fulfilled its escrow and loan obligations and that the inability to fund was not due to anything [buyer] had failed to do. Indeed the loans could not be funded nor could the escrows close on the scheduled closing date because [seller] had failed to comply with its escrow obligations." (*Ninety Nine Investments,* at p. 1134.) Because the undisputed "evidence established that [seller's] failure to timely comply with its escrow obligations prevented the escrows from closing and the loans from funding by the closing date when they otherwise would have. [Seller's] conduct therefore operated to excuse [buyer's] performance by the closing date." (*Id.* at pp. 1135-1136, fn. omitted.)

In contrast to the seller in *Ninety Nine Investments,* the de la Cruzes did nothing to prevent Equassure's performance; nor was this an especially complex escrow with sequential performance conditions. Rather, the remaining obligations of both sides were due "at close of escrow." As the trial court found,

both Equassure and the de la Cruzes were unable to fulfill their respective performance obligations, through no fault of the other, in a time-is-of-the-essence contract that specified escrow would close without contingencies or extensions on August 18, 2016. Whether the performance obligations of both parties were discharged, as *Pittman* held, or fully excused due to the other's simultaneous failure to perform, the result is the same. Both sides failed to perform; neither can recover for breach of contract. (See generally *Chan v. Title Ins. & Trust Co., supra,* 39 Cal.2d at p. 258 ["time is of the essence" clause strictly enforced unless waived]; *Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1337-1338 ["our review of the authorities reveals that California courts generally *do* strictly enforce time deadlines in real estate sales contracts, permitting the seller to cancel after the time specified where time is specifically made of the essence *unless* there has been a waiver or potential forfeiture"].)

Equassure insists this case differs from *Pittman* because of paragraph 19F in the VLPA, which Equassure describes as a "notice to cure clause." As discussed, that paragraph requires a seller who intends to cancel escrow due to the buyer's nonperformance to deliver to the buyer a DCE, which can be served no more than three days before the date set for closure and must give the buyer at least three days to perform.[8] The DCE form, in turn, advises the buyer that, if it does not close escrow by the date identified in the DCE and the seller has fully performed, the seller may cancel the escrow and seek legal

---

[8]     See footnote 4.

21

remedies including damages or specific performance.[9]  According to Equassure, because the de la Cruzes did not (and could not) perform or tender performance when they issued the DCE on August 22, 2016, the DCE did not trigger in Equassure any obligation to perform or be in default; and the de la Cruzes repudiated the agreement, if not on August 25, 2016, then at least on September 29, 2016 when they wrote to Equassure affirmatively declaring the escrow cancelled.

Contrary to Equassure's contention, paragraph 19F did not relieve the buyer of any obligation to perform until the seller tendered its own performance.  Rather, when read together with the clause requiring escrow to close on August 18, 2016 with no contingencies or extensions and expressly stating time is of the essence, paragraph 19F simply required the seller intending to cancel the escrow for buyer nonperformance to provide notice that the buyer had a specific time, not less than three days from the date of notice, to perform.  The paragraph does not mean that, if no DCE were delivered, or, as here, was delivered after the scheduled escrow close date of August 18th, that the parties' obligations continued without an ending date.  To hold otherwise would render the provision requiring escrow to close on August 18, 2016, no extensions, time is of the essence, meaningless.  (Cf. *Pittman, supra,* 2 Cal.App.4th at p. 560 ["such

---

[9]     The DCE, a printed California Association of Realtors form, states, "**Note To Buyer:**  If you do not close escrow by the end of time period specified in this Demand to Close Escrow, and Seller has fully performed, Seller may (i) immediately cancel the Agreement; (ii) bring legal action against you for damages . . .; or (iii) . . . (specific performance)."

a construction would render meaningless the parties' agreement that time is of the essence"].)[10]

Equassure argues that, at the very least, it and the de la Cruzes labored under a mutual mistake that their obligations would continue beyond August 18, 2016 until one party issued a DCE with a complete tender. That is clear, it asserts, not only from Stenson's testimony that the escrow would remain open until one party performed and put the other in default, but also from the August 22, 2016 delivery by the de la Cruzes of the DCE. Thus, Equassure argues the court erred in failing to rescind the contract for mutual mistake. However, Equassure did not seek rescission in the trial court based on mutual mistake, but on fraud. Accordingly, this argument is forfeited. (*Dumas v. Los Angeles County Bd. Of Supervisors* (2020) 45 Cal.App.5th 348, 357 [failure to raise argument in trial court results in forfeiture on appeal]; see generally *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [any right may be forfeited by failure to make timely assertion of right in trial court in first instance].)

Finally, even if the parties' obligations had not been discharged and continued for six more weeks until the de la Cruzes repudiated the VLPA on September 29, 2016, Equassure's breach of contract claim fails for another, fundamental reason: It failed to demonstrate it was ready,

---

[10] Equassure's focus on the de la Cruzes' failure to tender performance with its DCE is misguided. To be sure, had the de la Cruzes timely delivered a DCE at or before close of escrow and satisfied their conditions, they could have sued for breach when Equassure failed to perform. But the de la Cruzes did not perform, nor have they sued.

willing and able to perform at any time, be it August 18, 2016 (the date set in the VLPA), August 25, 2016 (the date set in the DCE) or September 29, 2016 (the date of the de la Cruzes' alleged repudiation).  (See *Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 625 [party seeking damages for breach of contract must demonstrate it was able to, and would have, performed if not for the defendant's repudiation; this requirement is not limited to action for specific performance]; *Dickey v. Kuhn* (1930) 106 Cal.App. 300, 303-304 ["elimination of the necessity of an offer of performance does not dispense with the proof [at trial] of ability to perform when that is made an issue in the case"].) The trial court found Equassure lacked the necessary funding and Stenson's evidence Equassure could obtain the funding from his investor brother too speculative, findings Equassure does not directly challenge, let alone establish were erroneous as a matter of law.  (See *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978-979 ["'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law,'" that is, whether the appellant's evidence was ""'uncontradicted and unimpeached" and . . .  "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding"'"]; see also *In re R.V.* (2015) 61 Cal.4th 181, 201 [where a party fails to carry its burden on an issue in the trial court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the [trial] court could not reasonably reject it"]; *Glovis America, Inc. v. County of Ventura* (2018) 28 Cal.App.5th 62, 71 [same].)

In sum, in a case in which both parties insisted the other perform first, while in reality neither was capable of performing at all, the trial court did not err in concluding Equassure could not carry its burden to demonstrate the estate breached the contract by failing to perform its concurrent conditions.

### 3. *The Court Did Not Err in Interpreting the VLPA as Making the First $75,000 Deposit Nonrefundable*

Equassure contends the court erred in construing paragraph 7 in addendum 2 of the VLPA—"$75,000 of Earnest Money Deposit to be released non-refundable, to the seller upon removal of physical contingencies at the end of 45 day due-diligence period"—to mean the deposit was nonrefundable for any reason. Citing paragraph 27B of the VLPA (the liquidated damages provision), Equassure contends the de la Cruzes may retain the Equassure's earnest money deposit only in the event Equassure's breach.[11] Because the court found Equassure did not breach (or that any breach was excused due to the de la Cruzes' nonperformance), it asserts, there are no damages to be liquidated; and Equassure's earnest money deposit is necessarily fully refundable.

In rejecting this argument, the trial court found use of the word "nonrefundable" to describe the first $75,000 deposit meant what it said: It is nonrefundable regardless of whether the buyer subsequently breached the agreement.

The parties offered extrinsic evidence on the interpretation issue: The de la Cruzes submitted letters and testimony from

---

[11] Paragraph 27B provides, "**Liquidated Damages:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid."

25

DiVincenzo to prove they had bargained for a nonrefundable deposit as part of the agreement to ensure they received some consideration for taking the property off the market for more than a year in the event the sale fell through, for whatever reason. Equassure, in contrast, citing the same correspondence, as well as Stenson's testimony, insisted consideration for the extended escrow was the increase in purchase price. The court provisionally considered the evidence (see *Wolf v. Walt Disney Pictures & Television, supra,* 162 Cal.App.4th at pp. 1126-1127) and concluded none of it suggested an ambiguity as to the meaning of nonrefundable. We agree. While forfeitures are disfavored (see *Ballard v. MacCallum* (1940) 15 Cal.2d 439, 444 [in the event of two possible constructions, one of which leads to a forfeiture and one of which avoids it, "the policy and rule are settled . . . , the construction which avoids forfeiture must be made if it all possible"]), there is no other reasonable construction of the word "nonrefundable" to describe the first $75,000 deposit.

Equassure's reliance on paragraph 27A of the VLPA is misplaced. That paragraph provides, in the event of buyer's breach, any contractual language that works a forfeiture or makes a deposit nonrefundable "shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code." In other words, any provision specifying a remedy for the buyer's breach must be reasonable at the time the contract was made in order to be valid. (See Civ. Code, §§ 1671, subd. (b), 1675 & 1676.) Because Equassure did not breach (or its breach is materially excused by the de la Cruzes' breach), there are no damages to liquidate. The question is solely one of contract interpretation. The court did not err in concluding the plain language of the

contract made the first $75,000 nonrefundable to the de la Cruzes even in the absence of Equassure's breach.

4. *Equassure Has Not Demonstrated the Court Erred in Concluding It Failed To Carry Its Burden on Its Fraud Cause of Action*

Equassure contends the court misunderstood its fraud claim as one of fraudulent concealment and found it could not carry its burden because the de la Cruzes disclosed the cloud on title prior to Equassure's agreement to the VLPA. Because it also alleged promissory fraud, contending the de la Cruzes induced its agreement to the VLPA without any intention of performing their obligations, including delivering marketable title, Equassure argues, the court's singular focus on the precontract disclosures of the cloud on title did not resolve their promissory fraud claim.

"'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; accord, *Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1453.) The elements of promissory fraud are "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage . . . ." (*Behnke,* at p. 1453.)

Contrary to Equassure's contention, the court understood, and directly addressed, its claim for promissory fraud, stating, "The essence of Plaintiff's fraud cause of action appears to be that

27

the Defendants had no intention of performing. They allegedly structured the transaction in order to obtain a significant portion of the purchase price ($150,000 to be exact) from escrow before the closing and then engage in chicanery in order to prevent the closing, thereby keeping the money as well as the property. The court is almost, but not quite, convinced of this intent." Although the court found the de la Cruzes not particularly knowledgeable about the transaction (concluding they relied entirely on DiVincenzo) or, for that matter, credible, the court found "the evidence does not preponderate" in Equassure's favor with regard to promissory fraud, implicitly finding the de la Cruzes intended to sell the property for $3 million at the time they entered into the VLPA.

The court went on to separately address the aspect of the fraud claim premised on the failure to disclose the problems with the Miletich heirs regarding clean title. The record does not support Equassure's contention the court misunderstood its fraud cause of action.

Equassure alternatively contends the court erred in concluding it had failed to carry its burden to demonstrate promissory fraud, emphasizing evidence that the estate filed a petition with the probate court to clarify title in June 2016, less than two months before escrow was scheduled to close, with a hearing date on the motion long after the closing date. Equassure also cites the de la Cruzes' failure to obtain a residential property report or waiver of such a report as further proof they never intended to perform the conditions of the VLPA. To obtain reversal on appeal, however, Equassure must do more than cite favorable evidence; it must show that it was entitled to judgment on the fraud claim as a matter of law because the

evidence was "uncontradicted and unimpeached" and of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding. (See *Juen v. Alain Pinel Realtors, Inc., supra,* 32 Cal.App.5th at pp. 978-979.)  In addition to the evidence Equassure cites, there was also evidence DiVincenzo engaged in efforts to clear the title to effect the sale.  Although the court found DiVincenzo could have been more forthcoming with Equassure as to those efforts, the court found the de la Cruzes intended to clear the title and sell the property at the time they entered into the contract. Equassure disagrees with the court's analysis, but it has not shown the court's findings were erroneous as a matter of law.

*The de la Cruzes' Appeal*

5. *The Court Did Not Err in Concluding the Estate Was Not Entitled to the Full $150,000 Deposit*

In response to Equassure's claim it was entitled to the return of the $150,000 it had deposited into escrow, the de la Cruzes argued Equassure had committed an anticipatory breach when, in letters and in a conversation with DiVincenzo in mid-August before escrow was scheduled to close, Stenson indicated Equassure lacked the funds to perform under the escrow terms and sought new terms.  As a result, the de la Cruzes contend the court erred in concluding Equassure was entitled to any part of the deposit that had been released to them prior to August 18, 2016.  They argue they are entitled to retain the entire $150,000 deposit as liquidated damages for Equassure's anticipatory breach.

An anticipatory breach of contract occurs when a party to a contract, expressly or by implication, repudiates the contract before the time for his or her performance.  (*Romano v. Rockwell*

*Internat., Inc.* (1996) 14 Cal.4th 479, 489; *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 463.) "'An express repudiation is a clear, positive, unequivocal refusal to perform [citations]; an implied repudiation results from conduct where the promissor puts it out of his power to perform so as to make substantial performance of his promise impossible.'" (*Mammoth Lakes Land Acquisition,* at p. 463.)

At the threshold, because the de la Cruzes did not file a cross-complaint for breach of contract, instead asserting Equassure's anticipatory breach only as an affirmative defense to Equassure's complaint, their claim to retain the entire $150,000 deposit as liquidated damages is, at best, suspect. They cite no authority to support their argument a seller who has not sued the buyer for breach of contract is entitled to retain a refundable deposit after the transaction has been cancelled, and we doubt such a proposition is valid.

In any event, the trial court did not err in concluding Equassure had not committed an anticipatory breach, finding Equassure's written proposals were just that, proposals, not unequivocal repudiations of the VLPA terms. Without directly disputing that finding, the de la Cruzes cite what they claim is uncontradicted evidence of an express repudiation of the VLPA— DiVincenzo's testimony that he had asked Stenson in early August 2016 whether Equassure was going to close without the entitlements and Stenson replied he "wanted the entitlements" before closing.[12] However, the de la Cruzes emphasized this

---

[12] DiVincenzo testified that, in mid-August, before the scheduled closing date, he asked Stenson directly, "Are you going

testimony in closing argument; and the court rejected it, implicitly interpreting Stenson's statement that he "wanted to close" with entitlements as an expression of desire, an interpretation consistent with both Stenson's testimony at trial and his written proposals. The court also questioned DiVincenzo's overall credibility at trial and resolved any conflict in the evidence on this point in favor of Equassure.

The de la Cruzes' argument Equassure "put it out of its power to perform" by failing to obtain a firm commitment from Stenson's investor brother to be able to close also fails. Whether Equassure had the funds to close on August 18, 2016 or not, it did not do anything prior to that time that made it impossible for it to obtain the funds at closing. (Cf. *Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 538 [the act of conveying the land to a third party during the 30-day extension period constituted an anticipatory breach].)

Relying on *Gold Mining & Water Co. v. Swinerton* (1943) 23 Cal.2d 19, 29, the de la Cruzes argue the trial court misapplied the law of anticipatory breach because proof of inability to perform on the date set for performance is sufficient for anticipatory breach. *Gold Mining* holds no such thing. In that case the Supreme Court explained the difference between anticipatory breach (a repudiation by the promisor before the promise is due) and a partial breach at time of performance followed by a total repudiation, which is also a breach, albeit not anticipatory. (*Ibid.*) To the extent the de la Cruzes argue they are entitled to the full deposit as liquidated damages due to Equassure's nonpayment of the purchase price by August 18,

---

to close without having your entitlements? And he [Stetson] answered that he wanted the entitlements before we closed."

2016, they failed to demonstrate Equassure's nonperformance was not discharged or excused by their own failure to fulfill concurrent conditions, including delivering marketable title. The court did not credit DiVincenzo's testimony the estate could have delivered marketable title by August 18, 2016 but for Equassure's anticipatory breach hindering his agreement with the Militech heirs. The de la Cruzes have not demonstrated that finding was erroneous as matter of law.

Finally, citing Civil Code section 3399, the de la Cruzes argue the omission of the word "nonrefundable" with regard to the second $75,000 deposit was scrivener error that did not reflect the actual agreement of the parties. (See Civ. Code, § 3399 ["[w]hen, through fraud or a mutual mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice" to the rights acquired by third parties in good faith].) They emphasize it was Stenson who, in precontract negotiations, initially proposed the idea of a nonrefundable deposits, made in two parts. Following negotiations in June and July 2015, DiVincenzo told Carew to prepare a counteroffer that would, among other things, make half of the deposit nonrefundable and released to seller after 45 days and the second half nonrefundable and released to seller 60 days after escrow opened. Carew responded, suggesting a counteroffer that required Equassure to deposit "$150,000 EMD [earnest money deposit] with 50% of it going non-refundable after the 45 days due diligence period . . . [and] [t]he remaining 50% of the EMD is released non-refundable 6 months from acceptance . . . ." On August 14, 2015 Equassure proposed its

32

own counteroffer, accepting some, but not all, of the estate's terms in Seller's addendum 2.

The record does not contain the conclusive evidence the de la Cruzes describe. The only addendum 2 in the record is addendum 2 of the VLPA, which omits the word "non-refundable" in connection with the second deposit. Citing the absence of any documentary evidence to support the de la Cruzes' argument of a mutual agreement that both deposits were intended to be nonrefundable, the court concluded there was neither ambiguity nor mistake. The VLPA meant what it said. The second deposit was refundable; the first was not. None of the extrinsic evidence the de la Cruzes highlighted compels a different conclusion.

6. *The Award of Prejudgment Interest Must Be Modified*

Civil Code section 3287, subdivision (a), provides, "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." "Under this provision, the trial court has no discretion—it must award prejudgment interest from the first day there exists both a breach and a liquidated claim." (*Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293; accord, *Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 198 [Prejudgment interest is "designed to compensate for the presumed harm caused by the inevitable delays inherent in litigation. While the party that ultimately prevails awaits final judgment in his or her favor, the losing party enjoys the use of the funds in question as the lawsuit winds its way through the courts. Thus, "'[t]he purpose of

33

prejudgment interest is to compensate plaintiff for [the] loss of use of his or her property""""].)

Finding Equassure was entitled to a refund of the second deposit pursuant to the VLPA, the court awarded Equassure prejudgment interest beginning on December 4, 2015, the date the escrow company wired the first deposit to the de la Cruzes as executors in accordance with the VLPA. Because the trial court ruled (and we have agreed) Equassure is not entitled to a refund of that deposit, the court's calculation was error.

While all parties agree the court's prejudgment interest calculation needs to be modified if we affirm the court's finding concerning the second $75,000 deposit, they disagree as to when prejudgment interest begins. Equassure contends it should commence on January 27, 2016, the date Stenson deposited the second $75,000 payment into the escrow. The de la Cruzes contend the appropriate date is October 4, 2016, when, they assert, Equassure formally demanded its deposit returned. In light of our holding the parties' obligations under the contract were excused or discharged when escrow did not close by August 18, 2016, August 19, 2016 is the date certain on which Equassure had the right to a refund of its second deposit. Accordingly, we modify the judgment to reflect an award of $21,534.24 in prejudgment interest.[13]

7. *Further Modification of the Judgment Is Not Necessary*

---

[13] The parties do not dispute the court correctly calculated a daily prejudgment interest amount of $20.54794. In modifying the award, we have multiplied that daily amount by 1048 days (from August 19, 2016 to July 3, 2019, the date of entry of judgment).

34

The de la Cruzes request we further modify the judgment to explicitly state the court's implied finding that they were not liable in this lawsuit in their individual capacities. No modification is necessary. The court found the de la Cruzes liable in their capacities as executors under the contract for $75,000. It found in their favor on all other claims, including the fraud claim, findings we have affirmed. There is no reasonable reading of the judgment in which the de la Cruzes were found individually liable.

## DISPOSITION

The judgment is modified to reflect prejudgment interest in the amount of $21,534.24. As modified, the judgment is affirmed. Equassure and the de la Cruzes are to bear their own costs on appeal.


PERLUSS, P. J.


We concur:



SEGAL, J.



FEUER, J.